MARLENE INDUSTRIES CORPORA-
TION, et al., Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

and

International Ladies' Garment Workers'
Union, Intervenor.

No. 81–1338.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 24, 1982.

Decided July 1, 1983.

Cornelius, Collins, Higgins & White, Charles Hampton White, Nashville, Tenn., J. Mack Swigert (argued), Taft, Stettinius & Hollister, Cincinnati, Ohio, for petitioners.

Max Zimny (argued), New York City, for intervenor.

Elliott Moore, Deputy Associate Gen. Counsel, Edward Dorsey (argued), N.L.R.B., Washington, D.C., for respondent.

Before KENNEDY and MARTIN, Circuit Judges, and SILER,* District Judge.

CORNELIA G. KENNEDY, Circuit Judge.

Petitioners ask that we review and set aside the order of the National Labor Relations Board[1] (Board) finding petitioner guilty of unfair labor practices in violation of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3), directing reinstatement of striking employees and awarding back pay. Petitioners urge that collateral estoppel bars many of the Board's findings and that the remaining findings are not supported by substantial evidence. The Board cross-petitions for enforcement of its order.

## HISTORY

Marlene Industries Corporation (Marlene) is engaged through wholly owned subsidiaries[2] in several southern states in the manufacture and sale of wearing apparel. Marlene has a history of having engaged in unfair labor practices. In 1967 the Board

---

* Honorable Eugene E. Siler, Jr., United States District Court for the Eastern and Western Districts of Kentucky, sitting by designation.

1. Reported at 255 N.L.R.B. No. 192 (1981).

2. Decaturville Sportswear Co., Inc. (Decaturville, Tenn.); Westmoreland Manufacturing Corp. (Westmoreland, Tenn.); Trousdale Manufacturing Co., Inc. (Trousdale, Tenn.); Frisco Sportswear, Inc. (Frisco, Ala.); Russell Sportswear Corp. (Russell Springs, Ky.); Aynor Manufacturing Co., Inc. (Aynor, S.C.); and Loris Manufacturing Co., Inc. (Loris, S.C.).

had found Marlene guilty of engaging in unfair labor practices and an enforcement order was issued by this Court in 1969, *Marlene Industries Corp.,* 166 N.L.R.B. 703 (1967), *enf'd,* 406 F.2d 886 (6th Cir.1969), which included an injunction against further unfair labor practices.

In 1970 Marlene was again embroiled in accusations of unfair labor practices in the pressing department of the Decaturville plant. Pressers at Decaturville were compensated on the basis of the quantity of work each produced. As a result of various changes in quality control and inspection, many pressers complained of a decline in production because they suffered financially whenever required to spend time on inspection. The pressers met and discussed the changes, voiced grievances to supervisors, and engaged in a work stoppage for which they were reprimanded.

On June 23, 1970, a supervisor in the Decaturville pressing department inspected a bundle of slacks recently pressed by Nelson Rushing. The supervisor found 5 or 6 pairs requiring repressing and returned them to Rushing. Under previous quality control procedures, repressing is all that would have been required. The supervisor informed Rushing that under the new rule in effect he was required to inspect in its entirety any bundle returned with 3 or more defects. Rushing protested that it was not his job as a presser to inspect his own work and he refused to do so on his own time. Other pressers likewise refused. Rushing voiced his complaints to another supervisor but nothing was resolved in that encounter either. Rushing was then instructed to go to the office of the plant manager. Rushing feared being discharged in private and, therefore, refused to go. Eventually the plant manager, accompanied by the personnel director, approached Rushing in the employees' lunch room. When Rushing persisted in his refusal to go to the office, the plant manager fired him, handing him two checks and a separation slip which had been prepared just before the encounter ("the Rushing incident").

Fifty-one or so pressers left the Decaturville plant in support of Rushing. Nonpressers left as well and eventually workers at Marlene's other plants joined in the protest.[3] The strikes continued until about September 28, 1974.

On June 24, 1970, the day after the initial Decaturville walk-out, Marlene sent a letter to all pressers stating:

> On June 23, 1970 you were discharged as an employee of this company because you refused to carry out the orders of the plant manager to perform your regular work.
>
> The company does not approve of your action; however, we feel that perhaps your actions were prompted by your emotions and do not represent your real attitude about your job.
>
> You are hereby offered immediate reinstatement to your former position and directed to report for work at 7:30 a.m. Friday, June 26, 1970. If you have not reported for work at the plant by 4:15 p.m. Monday, June 29, 1970, this company will conclude that you are no longer interested in employment at this plant.

JA Vol. I, p. 24; ALJ Lipton decision at p. 13.

The nine pressers who returned to work before the June 29th deadline were fully reinstated. The Board found that any striker offering to return to work subsequent to that date, however, was required to fill out a new-hire application, serve a 90-day probationary period, did not receive health insurance coverage until expiration of that probationary period, and was ineligible for certain vacation benefits.[4]

---

3. Strikes at the other subsidiary plants began on or about the following dates:

| | |
|---|---|
| Frisco | July 15, 1970 |
| Trousdale | |
| Westmoreland | |
| Aynor | July 16, 1970 |
| Loris | |
| Russell | May 4, 1971 |

4. The record shows that Marlene placed termination notices in the files of some of the striking employees. Contrary to the Union's contention that this constituted unlawful discharge in violation of the Act, we hold that absent evidence that the notice of termination was effectively communicated to the strikers, it cannot be found that they were constructively discharged.

On April 19, 1974, the Union[5] extended to Marlene, on behalf of the striking employees, an unconditional offer to return to work. Marlene responded with letters to individual employees, dated May 6, June 2, and August 30, 1974, offering reinstatement. The Board found Marlene's offers of reinstatement to be invalid, because not unconditional and because employees who did return were placed on probation or subjected to probationary restrictions regarding health insurance and vacation benefits.

When the Rushing incident occurred, the Board filed a contempt petition with this Court alleging that Marlene had violated the 1969 enforcement order by discharging Rushing and other pressers. The matter was referred to a United States District Judge as a Special Master who issued two decisional memoranda, dated October 5, 1973 and June 12, 1974, denying the Board's contempt petition. The Special Master's conclusion that the Board had failed to prove that Marlene was guilty of contempt was based upon particularized findings of fact. He found, for example, that Rushing was terminated for cause (Memorandum 10–5–73, p. 48a, ¶ 11, JA Vol. II, p. 923); and that the Decaturville pressers were given a bona fide offer of full and immediate reinstatement on June 24, 1970, the day after they went on strike (Memorandum 10–5–73, p. 49a ¶ 13, JA Vol. II, p. 924). On appeal from the Special Master's decision the Board accepted his findings of fact but challenged his conclusions of law. This Court issued a decision adopting the findings, conclusion, and recommendations of the Special Master. *NLRB v. Decaturville Sportswear Co., Inc.,* 518 F.2d 788 (6th Cir.), *cert. denied,* 423 U.S. 913, 96 S.Ct. 217, 46 L.Ed.2d 141 (1975).

In 1976, the Board filed the present unfair labor practice action also predicated on the Rushing incident. Relying on the prior contempt proceeding, an Administrative Law Judge recommended dismissal of the action based on res judicata and collateral estoppel. The Board reversed the Administrative Law Judge holding that because the Special Master in the contempt proceeding applied a "clear and convincing evidence standard" to establish contempt, his decision could not bar a subsequent unfair labor practice proceeding in which a "preponderance of the evidence" standard would be applied.[6] The Board remanded the proceeding to a second Administrative Law Judge who found Marlene guilty of unfair labor practices. The Board accepted most of his findings.

Specifically, the Board found Marlene's offers of reinstatement dated May 6, June 2, and August 30, 1974 to be invalid because they were not unconditional. Employees who did return were not reinstated to their former wages and benefits. The failure to offer full reinstatement immediately upon

Although it is not necessary for the employer to directly inform strikers of their discharge to effect termination of the employment relationship, *Highland Plastics, Inc.,* 256 N.L.R.B. 146 (1981); *Martin Arsham Sewing Co.,* 244 N.L.R.B. 918 (1979), there must be some communication of the employer's intent to discharge, as well as some affirmative action taken by the employer to reflect the severance of the employment relationship. *Matlock Truck Body & Trailer Corp.,* 217 N.L.R.B. 346, 349 n. 7 (1975), citing, *Comfort, Inc.,* 152 N.L.R.B. 1074, 1079 (1965), *enf'd in part and denied in part,* 365 F.2d 867 (8th Cir.1966); *Public Ledger, Inc.,* 63 F.Supp. 1008, 1015 (1945). *Compare Methodist Hospital of Kentucky, Inc., v. NLRB,* 619 F.2d 563, 568–70 (6th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980), citing, *Percival v. National Drama Corp.,* 181 Cal. 631, 637, 185 P. 972, 974 (1919):

A discharge cannot be effected by a secret, undisclosed intention on the part of the master. It must be done by some word or act communicated to the servant.
*Cf. NLRB v. European Cars Ypsilanti, Inc.,* 324 F.2d 606 (6th Cir.1963).

5. The International Ladies' Garment Workers' Union, AFL–CIO did not have majority status and had not been recognized by the Company as the exclusive bargaining representative for the strikers. The Union, had, however, organized, directed and financed the strike and picketing. The picketing was conducted behind signs displaying the name of the Union.

6. Marlene challenged the Board's order by petition to this Court. The petition was dismissed because the order was not a final order within the meaning of section 10(f). *Decaturville Sportswear Co., Inc. v. NLRB,* 573 F.2d 929 (6th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978).

receipt of an unconditional offer to return to work was found to be a violation of the National Labor Relations Act, §§ 8(a)(1) and (3). The Board found that the Decaturville and resulting sympathy strikes were unfair labor practice strikes. The Board ordered reinstatement for all strikers and back pay for certain listed strikers. Entitlement to back pay for others alleged to be strikers, but as to whom there was no evidence that they had engaged in the strike, was deferred to the compliance of the proceeding.

## COLLATERAL ESTOPPEL

[3] Marlene contends that the findings of a Special Master in a prior contempt proceeding, instituted by the Board because of the Rushing incident, preclude the Board from holding in this subsequent unfair labor practice proceeding that the strikers protesting the discharge of Rushing were unfair labor practice strikers.

This Court recently reiterated a summary of the related doctrines of res judicata and collateral estoppel as set forth in *Montana v. United States,* 440 U.S. 147, 153–154, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a *"right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies...."* *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49 [18 S.Ct. 18, 27, 42 L.Ed. 355] (1897). Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. [citations omitted]

Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *Parklane Hosiery Co. v. Shore,* 439 U.S.

322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1970); Scott, Collateral Estoppel by Judgment, 56 Harv.L.Rev. 1, 2–3 (1942); Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, Apr. 15, 1977) (issue preclusion). Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. *Southern Pacific R. Co., supra,* 168 U.S. at 49, 18 S.Ct. at 27; *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 507, 61 L.Ed. 1148 (1917). To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. [footnote omitted]

*United States v. Stauffer Chemical Co.,* 684 F.2d 1174, 1180 (6th Cir.1982) (emphasis added). *See also Bronson v. Board of Education of the City School District of the City of Cincinnati,* 687 F.2d 836, 840–841 (6th Cir.1982).

In deciding whether the Board was bound by principles of collateral estoppel to accept the findings of the Special Master, we must consider whether the Master's finding that Marlene had not engaged in unfair labor practices was "essential to a final judgment." If such a finding was essential to the Master's conclusion that Marlene was not in contempt of the prior court order, then the Board is precluded from relitigating whether Marlene's conduct surrounding the Rushing incident constituted an unfair labor practice. "It is basic to the law of collateral estoppel that a finding in one proceeding cannot bind tribunals in subsequent cases unless the finding acted as a basis for final judgment in the first." *United States v. School District of Ferndale,* 577 F.2d 1339, 1349 (6th Cir.1978); *see also The Evergreens v. Nunan,* 141 F.2d 927, 928 (2d Cir.), *cert. denied sub nom. Evergreens v. C.I.R.,* 323 U.S. 720, 65 S.Ct.

498, 89 L.Ed. 579 (1944). "The determination of an issue in an earlier proceeding must be essential to the judgment; it cannot be dicta." *Anthan v. Professional Air Traffic Controllers Org.,* 672 F.2d 706, 710 (8th Cir.1982). *See also Eastern Foundation Co., Inc. v. Creswell,* 475 F.2d 351, 354–355 (D.C.Cir.1973); *Louis Ender, Inc. v. General Foods Corp.,* 467 F.2d 327, 330–331 (2d Cir.1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973).

The Board and the Union intervenor argue that finding Marlene had not committed unfair labor practices was not essential to the Special Master's conclusion that the Board had failed to prove contempt by clear and convincing evidence. They contend that such a finding should be characterized as extraneous, dicta, and not essential to the prior judgment. We hold that they seek an unnecessarily narrow interpretation of the phrase "essential to the prior judgment;" such an interpretation is unwarranted. In order to determine whether Marlene had violated this Court's 1969 enforcement order, the Special Master had to find whether the discharge of Rushing was an unfair labor practice. Had he found that it was, this would have been dispositive of the question of contempt. Thus, the question of unfair labor practices was properly and "distinctly put in issue," *Paine & Williams Co. v. Baldwin Rubber Co.,* 113 F.2d 840, 843–44 (6th Cir.1940); *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897), and its determination was essential to the prior judgment for the purpose of applying collateral estoppel. As stated in *NLRB v. Brown & Root, Inc.,* 203 F.2d 139, 146 (8th Cir.1953):

> The general rule is that "Any right, fact or matter in issue and directly adjudicated, or necessarily involved in the determination of an action before a competent court in which a judgment or decree has been rendered upon the merits, is conclusively settled by the judgment therein and cannot again be litigated between the same parties and their privies, whether the claim, demand, purpose or subject-matter of the two suits is the same or not." [citations omitted]

Authority for this position is found in *Bronson v. Board of Education, Etc.,* 525 F.2d 344, 349 (6th Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976), where this Court applied issue preclusion to bar relitigation of the questions of segregative intent and constitutional infirmities. Determination of those issues was considered critical to a prior decision of the Court and, therefore, inquiry into them was foreclosed.

In the alternative, the Board contends that the prior contempt proceeding did not preclude relitigation of the issue of unfair labor practices because the party against whom preclusion was sought (*i.e.,* NLRB) had a significantly heavier burden of persuasion with respect to the contested issue in the initial action (*i.e.,* clear and convincing evidence), than it had in the subsequent action (*i.e.,* preponderance of the evidence). There is case law both supporting and opposing the Board's proposition *as framed.* At a minimum, it can be said that the vast majority of courts recognize that a difference in burden of proof is a factor which should be considered in applying the doctrine of collateral estoppel. *Restatment (Second) of Judgments* § 28(4) (1982). The question before us, however, is not the question framed by the Board.

Had the Special Master been free to conclude in a general-verdict-like fashion that the Board had failed to prove unfair labor practices by clear and convincing evidence, then the Board could now be heard to argue that it should not be precluded from attempting to prove its claim under the less stringent "preponderance of the evidence" standard. There would be merit to the argument that adverse disposition in the former action does not preclude favorable disposition in the latter. The Board, however, failed to distinguish between the findings of fact in the earlier proceeding and the ultimate question whether Marlene was guilty of contempt. The Special Master in the contempt proceeding was required to

make particularized findings of fact and conclusions of law. He did more than merely conclude that the Board had failed to prove contempt by clear and convincing evidence. He expressly found that Marlene had not engaged in unfair labor practices with respect to Rushing and the employees who struck in response to Rushing's discharge. (Memorandum 10–5–73, pp. 48a–52a JA Vol. II, pp. 923–927). Such findings dispose of the issue of whether Marlene had engaged in unfair labor practices and, therefore, preclude relitigation. Any contention that is necessarily inconsistent with this prior adjudication of a material and litigated issue is subsumed in that issue and precluded by the prior judgment. To the extent the Board's success in a subsequent unfair labor practice action would be contingent upon contrary disposition of the facts found by the Special Master, such an action is precluded.

We are mindful of the admonishment that "[n]either collateral estoppel nor res judicata is rigidly applied. Both rules are qualified or rejected when their application would contravene an overriding public policy or result in manifest injustice." *Bronson*, 525 F.2d at 344, citing, *Tipler v. E.I. duPont deNemours and Co.*, 443 F.2d 125, 128 (6th Cir.1971). We do not find, however, any special circumstances surrounding the case at bar which would justify affording the Board an opportunity to relitigate the issue. The Board has had a full and fair opportunity to litigate the issue in the forum of its choice, the contempt proceeding. Moreover, the forum in this second action did not afford the Board any procedural opportunities in the presentation and determination of the issues which were not available in the first forum. The Board is thus precluded from asserting in this unfair labor practice proceeding any allegation inconsistent with the issues of fact determined by the Special Master in the prior contempt proceeding.

A central issue of this controversy was determining the initial status of the strike which began at Decaturville in June 1970. Most of the allegations involving Marlene and its subsidiaries are entirely derivative and presuppose the existence of an unfair labor practice strike originating at Decaturville in June 1970. We have concluded that the Board was collaterally estopped by the findings of the Special Master in the prior contempt proceeding from now asserting that the strikers were initially unfair labor practice strikers; however, that finding does not dispose of this litigation. The Special Master found that the picketers were economic strikers. The Board also found them to be alternatively economic strikers.

We find ourselves unable to determine in the first instance all of the effects of an economic as opposed to an unfair labor practice strike on all of the various groups of workers at Decaturville and the subsidiary plants. We, therefore, remand the case to the Board to make an initial review of the effect of such a change in characterization of the strikes. 29 U.S.C. § 160(d); *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373, 59 S.Ct. 301, 306–07, 83 L.Ed. 221 (1939); *cf. NLRB v. Transmarine Navigation Corp.*, 380 F.2d 933, 940 (9th Cir.1967) (where case was remanded because court of appeals could not be certain that the Board would have issued the same remedial order had it not rendered an erroneous conclusion); *NLRB v. Glass*, 317 F.2d 726, 727 (6th Cir. 1963) (per curiam) (where this Court acknowledged its discretionary power under § 10(e) to remand for the taking of further proofs).

We pause now to consider a number of other issues raised on appeal which will arise again on remand.

## OBLIGATION TO REINSTATE STRIKERS

The Board found that the strikers had made an offer to return to work by means of a letter, dated April 19, 1974, from the Union to Marlene advising it of that fact and listing the names of the strikers it represented. Marlene asserts that the strikers never triggered its obligation to reinstate because the Union, which sent the

letter, had not obtained majority status as exclusive bargaining representative for the strikers. Marlene argues that absent evidence that the Union in fact was authorized by each striker to send this letter, the Union lacked authority to act as the strikers' agent. This proposition is without merit. Substantial evidence supports the Board's finding that the Union, although it did not have majority status, did in fact represent the striking employees and that the Company had sufficient notice of that relationship. "The right to reinstatement does not depend upon technicalities relating to application." *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 381, 88 S.Ct. 543, 547, 19 L.Ed.2d 614 (1967). "Nothing in the Act precludes a minority union from acting as the employee's agent to request reinstatement...." *NLRB v. I. Posner, Inc.,* 304 F.2d 773, 774 (2d Cir.1962). *NLRB v. W.C. McQuaide, Inc.,* 552 F.2d 519, 529 (3d Cir.1977); *see also American Machinery Corp. v. NLRB,* 424 F.2d 1321, 1328 (5th Cir.1970). An employer is not permitted to delay reinstatement by insisting on individual striker requests to be reinstated—a collective request through a union is sufficient.[7] *National Business Forms, Inc. v. International Printing Pressmen & Assistants' Union of North America, AFL–CIO,* 189 N.L.R.B. 964

(1971), *enf'd,* 457 F.2d 737, 741. Accordingly, the Union's letter of April 19, 1974 triggered Marlene's obligation to reinstate the strikers.

Marlene contended below that in any event it fulfilled its obligation to offer reinstatement to the strikers through letters sent to individual strikers in May, June, and August of 1974 offering such reinstatement. The Board, however, found these letters invalid as they included unlawful conditions and/or unreasonably limited the time in which the strikers were required to respond.[8] Marlene does not advance on appeal the legitimacy of its letters dated May and June, 1974. It contends only that its letter of August 30, 1974 was a valid offer of reinstatement. The Administrative Law Judge found, and the Board affirmed, that the August 30 letter substantially failed to offer valid, bona fide and full reinstatement to the Decaturville pressers and non-pressers upon their unconditional application for reinstatement. JA Vol. I, p. 50; ALJ Lipton decision at p. 39. We need not pass on the sufficiency of the August 30th letter since the record supports the finding of the Board that those strikers who did respond to Marlene's offer of reinstatement were, in fact, denied employment on any basis other than as new hires.[9] They were required to

7. As we are dealing with a minority union, however, the Company is not precluded from communicating with the strikers directly.

8. The decisions of the Special Master pre-dated these purported offers of reinstatement and, therefore, the Board was not collaterally estopped from passing on the question of their validity.

9. General Counsel specifically stated that he did not allege as an unfair labor practice the termination of Bobby Gregory and Clovis Merryman, two employees at the Trousdale plant who were terminated for cause—fighting on the job. It was contended in the complaint only that they were unlawfully denied reinstatement. ALJ Lipton held that since Gregory and Merryman had been lawfully discharged, they had no reinstatement rights. The fact that they joined the picket line did not invest them with striker status. JA Vol. I, p. 59; *Lipton decision* at p. 48. We agree. The Board found that the Company had unlawfully refused to rehire—as opposed to reinstate—Gregory and

Merryman and, therefore, modified Lipton's decision by ordering their reinstatement.

Likewise, ALJ Lipton ordered and the Board affirmed the reinstatement of Eloise Turberville, a Frisco employee who had been terminated for cause prior to the strike. It was reasoned that she had been repeatedly refused reemployment in violation of the Act because she had engaged in picketing activity. JA Vol. I, p. 81; *Lipton decision* at p. 70. As noted above, as a lawfully discharged employee, Turberville has no right to reinstatement.

The question is whether the Board is precluded from finding that Marlene failed to rehire Gregory, Merryman and Turberville because General Counsel did not specifically plead that offense. In the case of a minor variation from the charge in the complaint, failure to specifically plead an offense does not preclude finding a violation thereof. *See NLRB v. MacKay Radio & Telegraph Co.,* 304 U.S. 333, 349–50, 58 S.Ct. 904, 912–13, 82 L.Ed. 1381 (1938). *Failure to reinstate strikers, however, is quite a different offense from discrimination in hiring. NLRB v. Pepsi-Cola Bottling Co. of Topeka,* 613

complete new employment applications; they began work without previous seniority; they were subjected to 90-days probationary period; they were ineligible for health insurance benefits until expiration of that probationary period; and they were denied vacation benefits. The Board found that a striker's failure to respond to Marlene's purported offer of reinstatement does not per se preclude reinstatement and an award of back pay because response was obviated on the realistic assumption that it would have been futile. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 366, 97 S.Ct. 1843, 1870, 52 L.Ed.2d 396 (1976); *NLRB v. Valley Die Cast Corp.,* 303 F.2d 64, 66 (6th Cir.1962). Accordingly, as of April 19, 1974, Marlene had an obligation to reinstate the strikers to substantially equivalent positions which were, or became, available.[10]

■ Sympathy strikers enjoy the same reinstatement rights as primary strikers. *NLRB v. C.K. Smith & Co., Inc.,* 569 F.2d 162, 165 (1st Cir.1977), *cert. denied,* 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978). The Special Master in the contempt proceeding specifically found that the sympathy strikers at Decaturville and the other subsidiaries' plants were motivated at least

in part by their own economic interests. Thus, whether viewed as primary or sympathy strikers, these employees are likewise properly treated as at least economic strikers.[11]

## ORDERING REINSTATEMENT PRIOR TO DETERMINING ENTITLEMENT

■ Marlene also questions the propriety of that portion of the Board's order requiring it to reinstate certain individuals whose entitlement to striker status could not be determined from the record and had been deferred to the compliance stage of the proceeding. As a general rule complex factual issues relating to the computation of the amount to be awarded following a back pay order are reserved for resolution at the compliance stage of the proceeding.

Ordinarily, the Board utilizes a two-stage procedure in unlawful discharge cases. The initial stage involves a determination of whether an unfair labor practice has been committed, and if so, whether a general order requiring reinstatement with back pay is appropriate under the circumstances. In such a proceeding the Board does not attempt to compute the amount of back pay owing.

---

F.2d 267, 273 (10th Cir.1980). On remand it must be determined whether the issue of "failure to hire" was fully and fairly litigated. If so, there is substantial evidence on the record to support the Board's findings that Marlene failed to rehire. If not, the Board is precluded from finding Marlene committed that offense. *Cf. NLRB v. Johnson,* 322 F.2d 216, 220 (6th Cir.1963) (where the issue of discriminatory discharge was found not to have been fully and fairly litigated).

**10.** The Union notified the Company by letter dated September 4, 1974, that seven strikers [Mae Rushing, Blanche Averett, Ben Hamm (not included in complaint), Sue Scott, Helen (Eason) Rhodes, Zora Quinn, and Susie Stout] had decided to continue the strike. By a letter dated September 20, 1974, the Union indicated that all strikers, including the seven previously declining to abandon the strike, would return to work on September 26, 1974. The strikers did not actually return until September 28, 1974. Since Mae Rushing, Averett, Quinn and Stout were wrongfully terminated on August 7, 1974, the administrative law judge found reinstatement requests were obviated as to them, nullifying the effect of the September 4 and 20

letters. As to Scott and Rhodes, entitlement to back pay, if any, is tolled for the period between September 4 and September 28. Although the administrative law judge found (JA Vol. I, p. 50; ALJ Lipton decision at p. 39) that back pay was tolled only until September 20, the date of the letter retracting the September 4 refusal to return to work, we find that since the September 20 letter offered to return to work on September 26 and the strikers did not actually return until September 28, back pay is properly tolled until September 28.

**11.** The Union notified the Company by letter dated September 4, 1974, that certain employees at the Trousdale, Westmoreland, Aynor, and Loris plants had decided to continue the strike. By a letter dated September 20, 1976, the Union indicated that all strikers, including those previously declining to abandon the strike, would return to work on September 26, 1974. The strikers did not actually return to work until September 28, 1974. The implications of the September 4 retraction and September 20 reinstatement of the unconditional offer to return to work must be explored on remand.

Following judicial enforcement of its general remedial order, the Board fixes the amount of back pay liability, either by negotiation or following an evidentiary hearing at which the employer is permitted to present evidence in mitigation of the gross amount of back pay computed by the Board. [citations omitted] *Dayton Tire & Rubber Co. v. NLRB,* 591 F.2d 566, 571 (10th Cir.1979). We, however, are presented with the distinguishable situation where entitlement to, and not merely computation of, back pay has been deferred to the compliance stage. Marlene has been ordered to reinstate certain individuals prior to any determination that those individuals are entitled to reinstatement.

Although the Board has broad power in fashioning a remedy, *Dayton Tire, supra,* at 569–570, its discretion is not unbridled. It is expressly constrained by the language of 29 U.S.C. § 160(c) which provides in pertinent part:

> No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause.

*See Fibreboard Paper Products Corporation v. NLRB,* 379 U.S. 203, 217, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964).

Often there is no question of whether former employees are strikers. Here, however, employees left their jobs at various times, either singularly or in groups, and some returned only to leave again at a later time. The Board found that the record was insufficient to determine whether a number of listed persons were strikers, yet it ordered blanket reinstatement of all persons listed. Such an order is overly broad because it compels Marlene to reinstate individuals absent a showing of wrongful discharge. As noted in *General Motors Corporation v. NLRB,* 512 F.2d 447, 448 (6th Cir.1975), orders of the Board are unenforceable and too broad where they do not correspond with violations actually found. *Cf. Detroit Edison v. NLRB,* 440 U.S. 301, 316–317, 99 S.Ct. 1123, 1131–1132, 59 L.Ed.2d 333 (1979) (where portion of Board order granting scant protection to the company's interest in test secrecy was set aside); *NLRB v. Jacob E. Decker and Sons,* 569 F.2d 357, 365–366 (5th Cir.1978) (where it was held inappropriate for the Board to order reinstatement of two discharged employees after having conceded that further proceedings would be necessary to determine whether reinstatement would frustrate the purposes of the Act by creating an unacceptable employment relationship).

Accordingly, the Board is precluded from ordering reinstatement or back pay where there is no finding that a discharge constituted an unfair labor practice.

## SUCCESSOR LIABILITY

Hoffman-Landlubber, purchaser of one of Marlene's plants, the Frisco plant, contests the Board's finding that it is subject to liability as a successor corporation.

Hoffman-Landlubber can be held jointly and severally liable with Marlene-Frisco only upon finding (1) that there exists substantial continuity between the predecessor and successor corporations; and (2) that the successor had knowledge of the unfair labor practices of its predecessor prior to the date of purchase. Although there was sufficient evidence to support the Board's finding of continuity, there was insufficient evidence on the record as a whole to support its finding that Hoffman-Landlubber had knowledge, prior to its purchase of the Frisco plant, of the unfair labor dispute pending against the predecessor.

Continuity was found on the following facts: Hoffman-Landlubber retained the entire work force of Frisco and extended seniority and set pay levels generally in accordance with Marlene's practices before the sale; there was substantial continuity of management and supervisory staff; Marlene-Frisco and Hoffman-Landlubber retained the same attorney; there was only a minor hiatus during the transition period during which the plant did not function; and, pants were always made at the plant—Marlene-Frisco made women's pants while

Hoffman-Landlubber made men's pants, but that distinction is without significance.

Knowledge, on the other hand, was imposed upon Hoffman-Landlubber. Relying primarily upon the fact that the strike at Frisco preceded Hoffman-Landlubber's purchase of that plant by approximately two years, the Administrative Law Judge found that "Hoffman-Landlubber was aware, or must be charged with knowledge, of the strike" against the predecessor. JA Vol. I, p. 79; ALJ Lipton decision at p. 68. He further reasoned that as Hoffman-Landlubber had retained the same attorney and upper management as its predecessor, it could not be heard to claim that it lacked knowledge of the pending dispute. The Board adopted these findings.

Although the Board's conclusion may be superficially appealing, it is not supported by the record and must be reversed. Nowhere was it established that Hoffman-Landlubber ever saw the picketers. Although a staff engineer for Hoffman-Landlubber was shown to have visited the Frisco City plant prior to its purchase (Hearing before ALJ Lipton on August 22, 1978, in Jackson, Tenn., Tr. 2709–2710), the record does not support the inference that he saw picketers and, therefore, had knowledge of the strike. There was no testimony that strikers were picketing at the Frisco plant on the days he was there, or that they were picketing every day. It was never established that the picketing generally was so pervasive that a visitor to the plant would necessarily be put on notice of the strike. On the contrary, by analogy to the history of picketing by the primary strikers at the Decaturville plant, picketing devolved

"from an en masse thing where they picketed most of the day and anywhere from fifty to ninety something people [in 1970], to the point [in late 1971 to 1972] that they only had two to four people picketing at a time, and these people swapped out periodically." (Hearing before ALJ Lipton on January 9, 1979, in Monroeville, Ala., Tr. 726). There even was testimony that on one or two days no picketing occurred at Decaturville. *Id.* 729.

The Board also relied heavily on the testimony of Sam Tancreto, (Hearing before ALJ Lipton on November 14, 1976, in Florence, S.C., Tr. 1744–1758) Manager of the Boston Joint Board of the Amalgamated Clothing Workers of America, for its finding that Hoffman-Landlubber purchased with full knowledge of the labor dispute. Although Tancreto did testify that he had contacted Hoffman and had discussed labor relations, his testimony concerned contacts which occurred between January and May of 1973, a period of time subsequent to Hoffman's purchase of the Frisco City plant and, therefore, irrelevant to an inquiry into knowledge held prior to the date of sale. Likewise, the Board was not justified in relying upon Hoffman-Landlubber's employment of Attorney White, Counsel for Marlene, because there is no evidence he was so employed before the sale was consummated.

As there exists insufficient evidence on the record as a whole to support the finding that Hoffman-Landlubber had knowledge prior to its purchase of the Frisco plant of the unfair labor dispute pending against its predecessor, derivative liability cannot be imposed.[12]

---

12. In *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), the Supreme Court reviewed whether the Court of Appeals for the Ninth Circuit erred in determining that the evidence on the record offered substantial support for the Board's finding that the successor corporation had purchased the bottling business with knowledge of the unfair labor practices of its predecessor. The Court was mindful of the congressionally imposed limitation on its review of the court of appeals' determination: "This Court will intervene only in what ought to be the rare instance *when the standard appears to have been misapprehended or grossly misapplied. Id.,* at 172, 94 S.Ct. at 419, citing, *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). Thus limited, the Supreme Court upheld the conclusion that, on the record as a whole, substantial evidence supported the Board's finding of knowledge. We find *Golden State* to be factually distinguishable. There the successor corporation purchased the business after its predecessor had been ordered by the NLRB to reinstate certain individuals with back pay. Litigation was merely pending when

■ As to Hoffman-Landlubber's liability for its own action, we are mindful that the Board is collaterally estopped from concluding that the sympathy strikers at the Frisco plant were unfair labor practice strikers. Accordingly, determination of Hoffman-Landlubber's liability is limited to a review of its reinstatement practices vis-a-vis economic strikers.

Hoffman-Landlubber had the obligation to reinstate the economic strikers when it received an unconditional offer to return to work. The Board found that the first alleged offer to return to work consisted of a cover letter addressed to M. Hoffman & Sons and signed by counsel for the Union, which referred to an enclosure of thirty-five (35) offers of reinstatement which had been addressed to Marlene, and returned to the Union marked "refused-Out of Business." The Administrative Law Judge found that "[n]o evidence [had been] offered by the General Counsel that the January 19, 1973, letter was mailed, and none was offered by Hoffman that it was not received." JA Vol. I, p. 76; ALJ Lipton decision at p. 65. The burden was on the General Counsel to establish the existence of an unconditional offer to return to work. General Counsel did not satisfy that burden and, therefore, it cannot be found that Hoffman-Landlubber's obligation to reinstate was triggered on January 19, 1973.

The Board found that a second offer to return to work was made in early January 1973 when Sam Tancreto conveyed a message to Hoffman that the strikers desired employment. The contents of several conversations between Tancreto and Hoffman were not disclosed on the record. The Administrative Law Judge merely found that Hoffman ultimately took the position that "every striker make application to the firm and the firm would judge whom they wanted to hire. These conversations were reported back to the Union." JA Vol. I, p. 76–77; ALJ Lipton decision at pp. 65–66. We find that the conversations between Tancreto and Hoffman appear to be negotiations and we cannot find any evidence that amounts to an unconditional offer to return to work.

On May 8, 1973, the Union wrote Hoffman and made, on behalf of 35 strikers, an unconditional offer to return immediately to work. It was Hoffman-Landlubber's responsibility at that time to immediately reinstate the strikers if positions were available and/or to reinstate the strikers as positions became available. Hoffman-Landlubber did not do so. Rather, it advised the Union that individual employees interested in obtaining employment should apply at the plant. As noted earlier, an employer is not permitted to delay reinstatement by insisting on individual striker requests to be reinstated—a collective request through a union is sufficient. Because this was a minority union, however, Hoffman-Landlubber was not precluded, after receiving the collective request, from contacting the strikers directly and requesting that they return to work. Here, although Hoffman-Landlubber responded through the Union, it did not offer reinstatement. It merely stated that it would not discriminate against

Hoffman-Landlubber made its purchase. The unfair labor practices at issue in *Golden State* occurred at the facility which was purchased, whereas the Frisco plant which Hoffman-Landlubber purchased was a plant of a separate subsidiary—merely the site of a sympathy strike. The officer of the predecessor corporation who had committed the unfair labor practice in *Golden State* continued in the employ of the successor. That officer engaged on at least one occasion in sales negotiations with an officer of the predecessor corporation, and the trial examiner made a finding of fact that the successor corporation had been informed during the course of the negotiations of the unfair labor practice litigation. The Board and the Court found it incredible that this officer who was so deeply involved in the predecessor's unfair labor proceeding would not have mentioned it during purchase negotiations. The only representative from Hoffman-Landlubber to visit the Frisco plant was a staff engineer, and the record does not support the inference that he saw picketers, had knowledge of the strike, or relayed such knowledge to Hoffman-Landlubber. Accordingly, unlike the record in *Golden State*, there exists insufficient evidence on this record to support the finding that Hoffman-Landlubber had knowledge prior to its purchase of the Frisco plant of the unfair labor dispute pending against its predecessor.

former strikers in offering employment. At this point Hoffman-Landlubber violated the National Labor Relations Act §§ 8(a)(1) and (3). Accordingly, Hoffman-Landlubber's liability for back pay runs from those points in time on or after May 8, 1973, when it failed to reinstate the Frisco strikers into positions which were, or subsequently became, available.

We deny enforcement of the Board's order and remand for proceedings consistent with this opinion.