NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

SOUTH HARLAN COAL, INC., Respondent.

No. 86–6036.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 15, 1987.

Decided April 19, 1988.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Beverly Oyama (argued), Linda J. Dreeben, Washington, D.C., Emil C. Farkas, Director, Cincinnati, Ohio, for petitioner.

Otis Doan, Jr. (argued), Doan and Melvin, Harlan, Ky., for respondent.

Before JONES, WELLFORD and BOGGS, Circuit Judges.

BOGGS, Circuit Judge.

The National Labor Relations Board (NLRB) seeks enforcement of its second supplemental order [1] imposing successor liability on South Harlan Coal Company, Inc. (South Harlan). This case presents the issue of whether substantial evidence in the record exists to support the NLRB findings that substantial continuity of business operations existed between the successor South Harlan and the predecessor Croley Coal Co., Inc. (Croley Coal), and that the President of South Harlan, Roy Dan Jackson, had knowledge of certain unfair labor practices committed by Croley Coal at a certain coal mine, at the time Jackson purchased that coal mine from Croley Coal. After reviewing the parties' briefs and relevant portions of the record, we affirm the NLRB findings, and grant enforcement of the NLRB order against South Harlan.

## I

Roy Dan Jackson, President of South Harlan, operated several coal mines in Harlan County, Kentucky, population approximately 30,000, where Jackson has lived his whole life. During the 1980–81 winter, Jackson personally negotiated for the purchase of a mine known locally as Mine No. 12, owned at that time by Harlan Fuel Corporation (Harlan Fuel). Mine No. 12 is located near Smith, Kentucky, southwest of Cawood, Kentucky, off of county road 987 near the Kentucky–Tennessee State line. It is also accessible from a back road leading from State Route 72. When negotiations fell through, Croley Coal, a competing local mining operation, purchased Mine No. 12.

In June 1981, miners picketed Mine No. 12 in protest of certain alleged unfair labor practices of Croley Coal. Stanley Collins, a

1. The second supplemental decision of the NLRB was issued on June 24, 1986, and is reported at 280 NLRB No. 104.

miner, and Southern Labor Union, Local 206, filed an unfair labor practice charge against Croley Coal on June 8 and 18, 1981.[2] The basis of the charge was President Croley's refusal, on May 29, 1981, to employ the former employees of Harlan Fuel, unless they abandoned the Union as their collective bargaining representative.

At the time this charge was filed, Jackson operated two mines, Mines No. 8 and No. 9. As the Board found, the two mines were contract-mined by Penellee Coal Company, of which Jackson was part owner and Vice–President, and were owned by one of James Croley's other companies, Golden Glow. The entrances to Mines No. 8 and No. 9 were within about two miles of the entrance to Mine No. 12.

According to undisputed testimony in the record, picketing at Mine No. 12 lasted for about two weeks after May 29, 1981, with an average of six to eight picketers. In addition, about 25 or 30 picketers also appeared at a fork in the road on state Route 72, with one direction leading to Croley Coal's main office at Liggett, Kentucky, and the other to Yancy, Kentucky. The Board found that travel on either of the only two routes leading to Mines No. 8 and No. 9 would have taken Jackson past one of the two locations where the picketing occurred. Though it was never specifically established in the record that Jackson drove by the picketing of the unfair labor practices, Jackson had an office at Cranks, Kentucky, not too far from Mine No. 12. A drive from Cranks toward Mines No. 8 and No. 9, would have taken Jackson past the picketing at the Mine No. 12 entrance. On the other hand, a drive from Harlan, the county seat, to Mines No. 8 and No. 9 would have taken Jackson by the picketing on Highway 72 and, as indicated above, within about 2 miles of the Mine No. 12 picketing.

During 1981, Jackson actively served on the Board of Directors of the Harlan County Coal Operators' Association which directly involved the business of coal mining. During 1981, Jackson also served as Chairman of the Harlan County Democratic Party. The record therefore shows that Jackson generally was quite active in civic and community activities in Harlan County.

During the first week of June 1981, *The Harlan Daily Enterprise*, a local newspaper with large circulation in the county, published three front page articles describing the picketing at Mine No. 12. One of these articles indicated that the Union had filed unfair labor practice charges against Croley Coal Co., Inc. with the National Labor Relations Board.

Shortly thereafter, Jackson personally resumed his attempts at purchasing Mine No. 12, by this time owned by Croley Coal. Jackson dealt directly with the owner of Croley Coal, James Croley. After preliminary negotiation, Jackson presented Croley with a proposal to buy Mine No. 12. On January 19, 1982, Croley and Jackson signed a purchase agreement to transfer operations of Mine No. 12 to South Harlan. The agreement provided for the sale of all Croley Coal stock to South Harlan, and, *inter alia*, stated that South Harlan had agreed to cause Croley Coal to pay for existing and future obligations incurred by Croley Coal regarding Mine No. 12.

Shortly after signing the agreement, Jackson began operating Mine No. 12, now part of South Harlan, with virtually no break in operations, performing essentially the same business as Croley Coal.

## II

An employer will be jointly and severally liable for the unfair labor practices of its predecessor when (1) there exists substantial continuity of business operation between the predecessor and successor corporations; and (2) the successor had knowledge of the unfair labor practices of its predecessor prior to the date of purchase. *Marlene Industries Corp. v. NLRB*, 712 F.2d 1011, 1020 (6th Cir.1983); *NLRB v. East Side Shopper, Inc.*, 498 F.2d 1334, 1336 (6th Cir.1974).

This Circuit has noted that "significant policy reasons [exist] for requiring the

2. The NLRB issued an unfair labor practices complaint against Croley Coal on April 9, 1982.

Board, rather than an instrumentality of this Court, to make the initial factfinding on successorship." *Aquabrom, Division of Great Lakes Chemical Corp. v. NLRB,* 746 F.2d 334, 336 (6th Cir.1984). We have likewise acknowledged that the NLRB possesses special expertise in the successorship area. *Ibid.* Consequently, the Board's findings on the successorship issue must be accorded a high degree of deference. If substantial evidence exists in the record as a whole to support these findings, this court must uphold them.[3]

The Supreme Court has established that " '[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Universal Camera Corporation v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). The Court has also stated that substantial evidence " 'must do more than create a suspicion of the existence of the fact to be established.... it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' " *Ibid.* (quoting *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)). The Supreme Court has indicated that these principles guide review of NLRB findings in a successorship case. *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 181, 94 S.Ct. 414, 423, 38 L.Ed.2d 388 (1973). Thus, an NLRB finding that an employer is a "successor" must be affirmed if supported by substantial evidence on the record as a whole, and this court must not "even as to matters not requiring expertise ... displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corporation, supra* 340 U.S. at 488, 71 S.Ct. at 465. Accordingly, we now review the NLRB findings with these principles in mind.

## III

On the first prong of the successor liability test, the Board found that there existed a substantial continuity of business operation between the predecessor Croley Coal and successor South Harlan. We find that substantial evidence in the record as a whole supports the Board's conclusion that the NLRB had met its burden of establishing a substantial continuity of business operation between Croley Coal and South Harlan, despite any erroneous formulation of the burden of proof by the Administrative Law Judge (ALJ).

On appeal, South Harlan contends that there was no substantial continuity between its operation of Mine No. 12 and its predecessor's operation of the same, because it changed equipment, used different trucking companies, mined a different part of the mine, sold its coal in the open market, and utilized a different mining system. However, the record fails to support South Harlan's contentions. First, the record shows that South Harlan principally used the same trucking company as did Croley Coal. Second, the record indicates that Jackson initially sold its coal to National Energy Resources, as did Croley Coal. Third, the record reveals that South Harlan used a "continuous mining" method at Mine No. 12, as did Croley Coal.

After the transfer of operations, there were some equipment changes, and changes in the parts of Mine No. 12 which were mined by South Harlan. However, it appears that they were minor, and did not transform the essential nature of the mining operation. South Harlan continued the same business, and produced the same product at Mine No. 12 as did Croley Coal. Indeed, successorship liability has been imposed by this Circuit in circumstances involving significantly greater changes in business operation than in the case at bar. *E.g., NLRB v. Interstate 65 Corporation,* 453 F.2d 269, 271–74 (6th Cir.1971) (substantial continuity found where employer

---

**3.** 29 U.S.C. § 160(e) provides that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."

changed top management, record keeping and telephone systems, and undertook renovation, but where same services were rendered and eighty per cent of workforce was retained). *See also NLRB v. Jarm Enterprises, Inc.*, 785 F.2d 195, 200–201 (7th Cir.1986) (substantial continuity found where employer changed personnel policy, created and eliminated certain supervisory and job classifications, but workforce was essentially the same).

At the hearing before the Board, Jackson testified that after the purchase of Mine No. 12, he immediately hired new employees and supervisors constituting a majority of the workforce for that mine. He testified that he merely served in an "advisory" capacity to Croley Coal for two or three weeks before taking over operations. He also testified that he used his own machinery and did not know what happened to Croley Coal's equipment, and that he used a different trucking service to transport the mine's production.

However, such testimony contradicts the contents of Jackson's sworn affidavit to the Board dated April 12, 1983, and other evidence in the record. In that affidavit, Jackson unequivocally stated that South Harlan purchased Croley Coal stock "on or about January 15, 1982," that "the stock was transferred around February 1, 1982," and that "I (Jackson) ran the coal mine for two or three weeks before the stock transfer went through." In that affidavit, Jackson also stated that "South Harlan Coal Company retained the same employees at the mine as Croley Coal Corporation had employed," that these employees were not required to submit job applications, and that "South Harlan retained all of Croley Coal Corporation's mine foremen." [4] The ALJ found that "Jackson's affidavit of April 12, 1983, [was] the most reliable and probative indication of the truthfulness of the facts surrounding his takeover of Mine

#12." The Board subsequently affirmed this finding.

Given the unexplained discrepancy between the hearing testimony and the affidavit, and the fact that Jackson had been convicted of the felony of filing a false income tax return as recently as July 26, 1984[5], the Board was well within its discretion to credit Jackson's sworn affidavit of April 12, 1983.[6] Thus, substantial evidence exists in the record to support the NLRB conclusion that the first prong of the *Marlene* test had been satisfied.

## IV

As to the second prong of the *Marlene* test, the Board found, based on various pieces of strong circumstantial evidence, that Jackson had knowledge of the unfair labor practices of Croley Coal regarding Mine No. 12, at the time Jackson purchased that mine, despite Jackson's denial of such knowledge. South Harlan devoted its entire oral argument, and the first portion of its brief, to the Board's finding regarding the second prong of the *Marlene* test.

First, South Harlan maintains that the Board wrongly held that South Harlan had the burden of proving that it lacked any knowledge of any unfair labor practices of Croley Coal. However, there is support for the principle that the successor has the burden of proving the lack of any knowledge of a predecessor's unfair labor practices. *Cumberland Nursing & Convalescent Center*, 263 NLRB 428 (1982). While the ALJ said that South Harlan bore that burden, he found many facts to support his finding that South Harlan did have knowledge of the unfair labor practices of Croley Coal, regardless of the burden of proof on this prong of the *Marlene* test.

Second, South Harlan argues that since Jackson had no actual knowledge of any

---

4. *See NLRB v. Wayne Convalescent Center, Inc.*, 465 F.2d 1039, 1041 (6th Cir.1972) ("the hiring of a large portion of the predecessor's employees is persuasive in finding successorship status.")

5. On July 26, 1984, about two months before Administrative Law Judge Beddow heard this

case, Jackson was convicted of the felony of filing a false income tax return.

6. In our view, the Board was correct in noting that under Fed.R.Evid. 801(d)(2) Jackson's affidavit would be an admission by a party-opponent, and therefore admissible.

allegations of unfair labor practices against Croley Coal, he cannot be held to have knowledge of those practices. South Harlan further argues that Croley's testimony in the record that he did not tell Jackson about the pending unfair labor practices charge before the NLRB, and the fact that no one ever testified that Jackson ever had any knowledge, is sufficient to invalidate the NLRB finding that Jackson had knowledge of the unfair labor practices of Croley Coal. We disagree.

As support for its first argument, South Harlan cites only the case of *Dominguez v. Hotel, Motel, Restaurant & Miscellaneous Bartenders Union, Local # 64; Holiday Inn,* 674 F.2d 732 (8th Cir.1982). However, South Harlan's reliance on *Dominguez* is misplaced. There, the Eighth Circuit held that at the time Kansas City Inns, Inc. purchased and began operating an Holiday Inn it had no knowledge, direct or indirect, of the charges of discrimination under Title VII pending against the Holiday Inn. Indeed, by its reference to "indirect" knowledge, the *Dominguez* court implicitly validated the principle that knowledge of pending discrimination charges could be inferred from the circumstances. Thus, notwithstanding South Harlan's argument to the contrary, *Dominguez* does not stand for the broad principle that actual knowledge is necessary to find knowledge in the context of successor liability litigation. Moreover, conspicuously absent from South Harlan's argument on appeal is any mention of *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 172–74, 94 S.Ct. 414, 419–20, 38 L.Ed.2d 388 (1973), which held that the Board need not accept the successor employer's denial of knowledge of unfair labor practices, but may draw a reasoned inference of knowledge from evidence in the record.

In *Golden State Bottling Co.,* All American Beverages, Inc. purchased Golden State Bottling Co.'s soft drink bottling and distribution business subsequent to an NLRB order to Golden State Bottling Co. to reinstate a driver-salesman with back pay. The principal question confronting the Supreme Court was whether, on the record as a whole, substantial evidence supported the Board's finding that All American purchased the business with knowledge of unfair labor practice litigation. Eugene Schilling, Golden State's secretary and manager of the bottling business, had committed the unfair labor practice, and as the Supreme Court states "closely followed the progress of the litigation." 414 U.S. at 173, 94 S.Ct. at 419. Schilling "continued with the enterprise under All American's ownership with the title of general manager and 'president.'" *Ibid.* The record showed that Schilling participated, on at least one occasion, in the sale negotiations with Golden State's president. The Supreme Court held that the evidence in the record was "sufficiently substantial to support an inference that Schilling informed his prospective employer of the litigation before completion of the sale." *Ibid.* While the facts differ significantly from the case at bar, *Golden State Bottling Co.* does clearly hold that knowledge of unfair labor practice litigation need not be actual, but may be inferred from the circumstances.[7]

Thus, neither Jackson's denial of any actual knowledge, nor the absence of any other testimony on Jackson's actual knowledge, precludes this Court from upholding the NLRB finding of knowledge of the unfair labor practices at Croley Coal in factual circumstances demonstrating his personal negotiation of the purchase of Mine No. 12, the close geographical proximity of Mines No. 8 and 9 to Mine No. 12, his strong degree of political and community involvement, the extensive news coverage of the picketing in protest of the unfair labor practices, and the local newspaper's specific and clear indication that unfair labor practices charges had been filed against Croley Coal prior to South Harlan's

---

7. While we recognize that *Golden State Bottling Co.* involved the issue of knowledge subsequent to an NLRB order, whereas the case at bar involves that issue after the filing of an unfair labor practices complaint, we do not regard that difference in the cases as material. In our view, *Golden State Bottling Co.* did not indicate or suggest that its holding was limited to the situation of an NLRB order.

purchase of Mine No. 12. To hold otherwise would be to permit successors in operations to evade too easily the strong congressional policy in favor of providing remedies for employees harmed by a predecessor's unfair labor practices. Such evasion cannot succeed simply by denying any actual knowledge of unfair labor practices charges, despite a strong circumstantial evidence basis from which knowledge could reasonably be inferred.

In our view, the Board was not required to accept Jackson's self-serving testimony for the additional reason that his credibility was weakened by evidence that he had been convicted of a felony of filing a false income tax return two months before the hearing; the Board noted his "overall evasive demeanor, [and] his consistent lack of recall or lack of apparent interest in events of seeming importan[ce] to his business activities...."

*Marlene Industries*, where this court denied enforcement of an NLRB order because a finding of knowledge was not supported by substantial evidence, does not provide support for South Harlan's position. There, this court relied on the fact that the unfair labor practices occurred at a place different from the plant that the successor purchased. The plant purchased was a plant of a subsidiary, separate from the plant where the unfair labor practices occurred. 712 F.2d at 1021–22 n. 12. Here, in contrast, Jackson purchased Mine No. 12, the precise locus of the unfair labor practices; and the news coverage concerned unfair labor practices which occurred at the place which was eventually purchased. Furthermore, in *Marlene Industries* the strike and concomitant picketing, on which the Board's finding of knowledge was based, preceded the successor's purchase of the plant by about two years. 712 F.2d at 1021. In the case at bar, however, the picketing preceded Harlan's purchase of Mine No. 12 by less than seven months. Finally, in *Marlene Industries*, the Board relied on testimony from a manager concerning contacts *subsequent* to the successor's purchase of the plant, and therefore, irrelevant to an inquiry into knowledge prior to the sale. *Ibid.* No

such misplaced reliance on subsequent testimony is present in the case at bar.

Evidence in the record to support the finding that Jackson had knowledge, or reasonably should have known of the unfair labor practices of, and the unfair labor practices complaint against Croley Coal, prior to its purchase of Mine No. 12, may be summarized as follows. First, Jackson was *personally* engaged in both the negotiations which fell through, and the negotiations which resulted in the purchase of Mine No. 12, and was the President of South Harlan, both before and after the purchase of Mine No. 12. Second, he lived in close geographical proximity to the situs of the unfair labor practices. While South Harlan contends that Jackson was absent from the county a great deal during the time of the labor dispute, the record does not substantiate this contention. Since the picketing persisted for two weeks, Harlan's suggestion that "daily" travel would have been necessary for Jackson to have witnessed the labor dispute is meritless. Thus, it is likely that Jackson would have personally witnessed the picketing of the unfair labor practices at Mine No. 12.

Third, Jackson had a leading role in a major association dealing with the coal mining industry in Harlan County, and was head of a local political party. Thus, Jackson's degree of civic and political involvement in the local coal mining community of Harlan County also suggests the strong likelihood of his awareness of the unfair labor practices. Fourth, the local newspaper with the largest circulation in Harlan County published three headline stories on the picketing at Mine No. 12; one story directly stated that unfair labor practice charges had been brought against Croley for its practices at Mine No. 12. While Jackson initially denied ever reading the newspapers, record evidence indicated that he had a newspaper receptacle in front of his house. Indeed, he admitted occasionally reading about mining disasters, political events, and about "something, somebody I knew real well, you know, or something like that...." Significant newspaper coverage only strengthens the view that Jack-

son knew or reasonably should have known of the unfair labor practices at Mine No. 12, and the unfair labor practices complaint filed in response thereto.

Fifth, the unfair labor practices occurred only a matter of months before the purchase of Mine No. 12. Such a short span of time between the commission of the unfair labor practices and consequential protest by employees, and the purchase of Mine No. 12, further increases the probability that Jackson knew of the unfair labor practices at Mine No. 12. Finally, Jackson's general denial of any actual knowledge of Croley's unfair labor practices, and his denial of ever having read the relevant newspaper articles discussing the unfair labor practices charge, reasonably could have been discredited by the Board, given its opportunity to observe the witnesses and the character evidence regarding Jackson's recent conviction for tax evasion.

Therefore, the Board's finding that South Harlan was a successor employer with knowledge of the unfair labor practices committed by its predecessor Croley Coal is AFFIRMED, and its order imposing successor liability on South Harlan may be ENFORCED.