## NATIONAL LABOR RELATIONS BOARD, Petitioner–Appellee,

v.

## FLUOR DANIEL, INC., Respondent–Appellant,

International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers, and Helpers, AFL–CIO, Intervenor–Appellee.

No. 94–6108.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 27, 1995.

Decided Dec. 18, 1996.

---

Joseph J. Jablonski, Jr., argued, N.L.R.B., Office of the General Counsel, Washington, DC, Aileen A. Armstrong, Deputy Associate General Counsel, Peter Winkler, briefed, William M. Bernstein, N.L.R.B., Appellate Court Branch, Washington, DC, for N.L.R.B.

Charles R. Schwartz, Michael J. Stapp, argued and briefed, Michael T. Manley, Blake & Uhig, Kansas City, KS, for International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers, and Helpers.

Melvin Hutson, argued and briefed, Dallas G. Kingsbury, Thompson & Hutson, Greenville, SC, for Fluor Daniel, Inc.

Before: BOGGS and DAUGHTREY, Circuit Judges; and McKEAGUE, District Judge.[*]

BOGGS, J., delivered the opinion of the court, in which McKEAGUE, D. J., joined. DAUGHTREY, J. (pp. 840–42), delivered a separate opinion concurring in part and dissenting in part.

BOGGS, Circuit Judge.

The National Labor Relations Board ("NLRB") has petitioned for enforcement of its order finding respondent, Fluor Daniel, Inc., to have committed various unfair labor practices against job applicants who are also union organizers and against an employee sympathetic to the union involved. The NLRB order imposed various remedial sanctions on Fluor Daniel as a result. We grant the NLRB's petition for enforcement in part and remand the remaining issues for further consideration in light of our opinion.

**I**

Fluor Daniel is a large California corporation engaged in the engineering, construction, and maintenance business throughout the United States. It is a so-called "open-shop" contractor.

In 1990, Fluor Daniel entered into a three-year contract to conduct service and maintenance work at various electric power generating facilities for the Big Rivers Electric Corporation. This work was to be performed during "outages," which occur when generating stations completely shut down for maintenance purposes. These outages were usually scheduled during off-peak times in the spring and fall. Below is a list, by location, of the outage times when Fluor Daniel performed work in 1990 [1]:

| | Plant | Location in KY | Dates |
|---|---|---|---|
| 1. | Henderson | Sebree | 2/22–3/10 |
| 2. | Coleman I | Hawesville | 3/11–3/31 |
| 3. | Wilson | Centertown | 4/09–4/21 |
| 4. | Green II | Sebree | 4/23–5/19 |
| 5. | Coleman III | Hawesville | 5/20–6/02 |
| 6. | Coleman II | Hawesville | 6/02–6/30 |
| 7. | Green II | Sebree | 3 weeks in Sept. |
| 8. | Wilson | Centertown | 6 weeks in Oct. & Nov. |

Fluor Daniel was terminated by Big Rivers in the fall of 1990, allegedly because of poor performance on Fluor Daniel's part.

Most of the workers Fluor Daniel hires are former employees, and the initial stages of the re-hiring process are typically conducted by phone, except that workers are not formally hired until they arrive at the work site. Fluor Daniel's typical secondary source is workers who hear about upcoming opportunities for work and simply show up at the work site looking for a job. The Wilson outage in April was larger than most, so the company took the unusual step of using a human resources coordinator to design and implement a staffing plan. Part of this staffing plan included creating a tertiary source of workers by accepting applications through the Kentucky Employment Service and running advertisements for the Wilson outage in local newspapers.

Barry Edwards, an organizer for the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers, and

---

[*] The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

1. This list is taken directly from the NLRB's Administrative Law Judge's opinion. *Fluor Daniel, Inc. & International Bhd. of Boilermakers,*

311 N.L.R.B. 498, 501, 1993 WL 188276, at *6 (1993) [hereinafter ALJ's opinion]. The roman numeral designations refer to different power plants at the same facility, not to chronological ordering.

Helpers, AFL–CIO ("Boilermakers' Union"[2]), obtained Fluor Daniel job applications from a Kentucky Employment Service office. He then distributed these applications to members who had indicated they would be willing to work as volunteer union organizers at Fluor Daniel. As a result of Edwards's efforts, the Boilermakers' Union returned 43 completed applications to Fluor Daniel. The company claims to have been unaware of the source of these applications at the time, but 42 of the 43 individuals wrote on their applications "voluntary union organizer" or similar words.[3]

By the time Fluor Daniel picked up the job applications from the Kentucky Employment Service office on March 26, 1990, Fluor Daniel claims that nearly all of the positions were filled. Fluor Daniel claims to have needed only 6 carpenters, 2 pipe welders, and 8 boilermakers at that time. This allowed Fluor Daniel's human resources coordinator to leave Kentucky by March 30, 1990, delegating the remaining hiring process to local project management. The NLRB disputes this assertion, pointing to the cross-examination of Fluor Daniel's human resources coordinator. During this cross-examination, an affidavit from the company's human resources coordinator was referred to, indicating that on March 29, 1990, Fluor Daniel needed 112 workers in unspecified crafts. Unfortunately, neither the ALJ nor the NLRB resolved this dispute.

Fluor Daniel placed 19 of the 43 applications into a pipe fitter category. Two of these applications, from Edward DeWitt and George Saltsman, were not fully completed. DeWitt had been employed previously by Fluor Daniel. DeWitt and Saltsman were less qualified than those who were actually hired, but the other 17 applicants sponsored by the Boilermakers Union were just as qualified. The NLRB's administrative law judge found that DeWitt had been discriminated against because of his union affiliation, but the NLRB ultimately reversed the ALJ on this point.

Four of the 43 applications were put into a boilermaker file, including those of brothers John Coons and Steven Coons. Each of these four applicants had experience equivalent to those who were actually hired by Fluor Daniel. Two of the 43 applications were placed into a boilermaker pipe welder file. Their experience level was also equal to that of those hired. Three of the 43 applications were placed into a pipefitter welder file. These applicants had extensive experience. Twelve of the 43 applications were placed into the ironworkers file. These applicants also had extensive experience. The last three of the 43 applications were placed into the laborer file. Fluor Daniel had not advertised or asked the Kentucky Employment Service for laborer applications, but it did hire some laborers, nevertheless.

Not one of these 43 applicants was hired, although Fluor Daniel did hire a significant number of other workers who had connections of some sort with organized labor.[4]

**2.** There were actually other unions involved at different stages in the story that unfolds below, but the Boilermakers' Union was clearly the most prominent. Also, the Boilermakers' Union is the intervenor in this case. Therefore, in the interests of simplicity, we treat the actions of any union involved in this case as if they were the actions of the Boilermakers' Union, as nothing hinges on which union was actually involved in any of the events described below.

**3.** Our review of the record indicates that Richard Bowlds's application does not have the designation "voluntary union organizer" or an equivalent written on it and the NLRB's appellate counsel concedes as much. Most of the applicants wrote "voluntary union organizer" or similar words in the place on the Fluor Daniel application labeled "related training courses." The remainder of the applicants affiliated with the Boil-

ermakers' Union placed these words at the top or bottom of the application.

**4.** At oral argument, the Boilermakers' Union argued that "all but ... four or five" of the applicants with union affiliations in their background who were hired had "countervailing" non-union experience, as well. Neither the ALJ nor the NLRB made such a finding, however. *See, e.g., ALJ's Decision,* 311 N.L.R.B. at 504, 1993 WL 188276, at *11 ("Respondent hired a number of employees for the Wilson outage in Centertown whose applications reflected some connection with organized labor"). The Boilermakers' Union's concession that four to five of the applicants had union backgrounds with no "countervailing" anti-union experience suffices to make Fluor Daniel's point that it could not have discriminated against *every* applicant with a union background.

For instance, some of the workers the company hired had been trained in union apprentice programs, or had worked for well-known union shop operations. It also hired a total of 52 workers with no apparent connection to organized labor, however.[5] The ALJ specifically refused to credit the testimony of a Fluor Daniel representative who stated that he telephoned a number of "voluntary union organizer" applicants that had been classified as boilermakers and pipefitters in order to fill welder vacancies.

While Fluor Daniels was still its maintenance contractor, Big Rivers obtained an unexpected opportunity to sell additional power, delaying the originally scheduled start of the Wilson outage. As a result, some of the craftsmen who had been lined up for employment by Fluor Daniel obtained other work. In particular, Fluor Daniel developed a great need for boiler tube welders. Four individuals who had written "volunteer union organizers" on their application were found to be qualified as boiler tube welders by Fluor Daniel's human resources coordinator. Three of them, Jerry Jackson and the Coons brothers, were offered positions contingent on passing a welding test or having the requisite certifications. Jackson never showed up at the work site (and his name was subsequently removed from the complaint at the hearing before the ALJ). The Coons brothers, however, did present themselves for employment at the work site.

Tube welding is more difficult than some other kinds of welding, and typically requires experience working with different materials. As a result, tube welders need current certification because of local building codes. The Coons brothers' certifications had expired and they were unable to complete successfully a test where a sample weld is analyzed by x-ray at an independent laboratory to see if there are any cracks or flaws in it. Fluor Daniel asked several other of its current employees working in different welding categories to attempt the test. One Fluor Daniel employee failed the test on the same day the Coons brothers did. He came back and

asked to be retested. He passed on his second attempt and was hired. Fluor Daniel maintains that it used a simpler stick-welding test only for other kinds of welders, never tube welders.

The ALJ found that three workers in addition to the one who asked to be retested were given easier welding tests, passed them and were then hired, although the ALJ did not find whether they were hired as tube welders. Scotty Bolen was one of those who was allowed to take the easier stick-welding test.

After failing the tube-welding test, John Coons asked whether any other work was available, telling a Fluor Daniel representative over the phone that he had scaffolding experience. The representative told John Coons to call back so that the representative could check on the need for scaffolders, because there had been such a need the previous day. When John Coons called back, the representative told him that the scaffolding job had been filled. Between the time that the Union set up a picket line at the first Wilson outage in April 1990 and the time that Fluor Daniel told John Coons there were no scaffolding positions available, the record shows Fluor Daniel hired only one tube welder, one ironworker, and two pipefitter helpers. Because the Coons brothers had been previously employed as tube welders, Fluor Daniel claims that it would not have hired them for lower-paid helper jobs.

On April 13, a picket line went up at the first Wilson outage. Within about nine days, the company hired a total of 36 additional employees, probably to make up for workers who either joined the picket line or refused to work as a result of it. No records were kept as to how many people honored the picket line, however. The picketing continued until after the outage ended on April 17. The Boilermakers' Union also raised a picket line at the first Green II outage, starting at the end of April. The company hired eighteen additional people at that time, and again

---

5. The ALJ found that there were 52 such workers, although Fluor Daniel maintains that there were 54. The company attempts to substantiate this claim by citing an exhibit that is indecipherable because it is poorly reproduced in the court's joint appendix. Therefore, we are satisfied to assume the ALJ was correct, as nothing hinges on the two-worker discrepancy.

no records were kept as to how many workers honored the picket line. None of the people hired during either outage were "volunteer union organizers."

Bolen was hired just before the first picket line went up and he honored it. Because Bolen had expressed concern about the picket line at the Wilson outage, representatives of Fluor Daniel met with Bolen and other employees. When Bolen asked what would happen if he refused to cross the picket line, Bolen maintained that a Fluor Daniel representative told him, "Well, the first time we give you an excused absence, the second time will be a written warning and the third time, we will terminate you." The ALJ credited Bolen's account, although the company claims it only told Bolen to follow his heart. Several days into the Green II outage, Bolen contacted the company and was rehired. He worked only one day before he left to honor a second picket line that went up at that site. What happened after this event is also disputed, but the ALJ found that Bolen called a Fluor Daniel representative and said that he would return to work if the picket line came down before the outage was completed. The representative agreed to call him back if this occurred. Fluor Daniel maintains that Bolen tendered his resignation at this time and that, as a result, it prepared a contemporaneous termination slip for Bolen. It is undisputed that Bolen was never given this slip, however, and that the company did not call him after the picket line came down. The same Fluor Daniel representative who told Bolen that he would be fired after his third absence as a result of honoring the picket line also told a Fluor Daniel time clerk to note that Bolen was a voluntary discharge, just a few days after Bolen refused to return to work.

During the second round of picketing, at the first Green II outage, a Fluor Daniel clerk asked the picketers what they wanted. They replied: "jobs." The clerk brought them some job applications. One of the picketers, however, testified that they later said to the clerk, "We've got these applications, don't you want them? And [the clerk] would never stop [to pick them up]." Later, Fluor Daniel received eleven applications that were mailed by Edwards. The NLRB now takes the position that these applications were those that were distributed to the workers on the picket line, and that all of the applications were for tube welders. The ALJ did not address these issues, or credit the picketer's testimony that Fluor Daniel's clerk refused to pick up applications.

Each of these eleven applications were also marked "volunteer union organizer," or some equivalent. Each of the eleven applicants had a "good deal" of work experience. Representatives of the Boilermakers' Union testified that substantial numbers of their members needed work. From this, and a lack of evidence that these workers were anything other than in need of work, the ALJ concluded they were bona fide applicants for employment within the meaning of *Willmar Elec. Serv.*, 303 N.L.R.B. 245, 1991 WL 135226 (1991), *enforced*, 968 F.2d 1327 (D.C.Cir.1992), *cert. denied*, 507 U.S. 909, 113 S.Ct. 1252, 122 L.Ed.2d 651 (1993).

A certified mail receipt retained by Edwards showed that these eleven applications were delivered on May 17, 1990. Fluor Daniel maintains it has a policy of refusing applications made in bulk, although earlier it had clearly picked up applications from the Kentucky Employment Service office in this form. The company hired only eight workers (one of them twice) after May 17, and each of them had established a good work record on prior Big Rivers outages in the spring. A total of 52 workers were hired who did not also work in the spring.

Fluor Daniel's job applications have a notice printed on them that the application is good for only 60 days from the application date. The company maintains this policy is just a necessary recognition of the way that their workers come to them—they have learned that their labor pool is not typically waiting around for more than 60 days without obtaining other employment.

At the conclusion of the spring outages, Fluor Daniel terminated all of its workers. There is no evidence that any of the "volunteer union organizers" sought work at this time. And no "volunteer union organizers" were hired thereafter, although 18 workers who had some connection with organized la-

bor were hired for the fall outages. The NLRB found that Fluor Daniel contacted certain potential workers for the spring outages whose applications were stale and that Fluor Daniel's original Wilson staffing plan included the following directive: "All applications will be retained for use in future staffing." Fluor Daniel's only response to this finding is that its attempts to contact and hire spring applicants were unsuccessful, confirming the wisdom of its general policy to let applications expire after 60 days.

The Union initiated an unfair labor practice charge on April 27, 1990, against Fluor Daniel under Sections 8(a)(1) and (3) of the National Labor Relations Act ("the Act") (29 U.S.C. §§ 158(a)(1), (a)(3)). The NLRB's Regional Director dismissed the case on August 6, 1990, citing Fluor Daniel's practice of hiring previous employees in relation to the Big Rivers outages and the fact that 20% of its workforce had indicated some previous union affiliation on their applications. On February 6, 1991, after several months of investigating new issues raised by the Boilermakers' Union, the Regional Director revoked his dismissal of the charge and issued a complaint against Fluor Daniel.

■ The case was tried before ALJ Martin J. Linsky in Owensboro, Kentucky in May and June of 1991. The company filed a motion in limine to attempt to force the General Counsel of the NLRB to state which positions it would contend Fluor Daniel had engaged in unfair labor practices in filling. This motion was denied, on the grounds that the General Counsel should be allowed to address this point in a post-hearing brief. Ultimately, the issue was deferred until the compliance stage of NLRB proceedings, at which point the burden of proof shifts to the private employer. See 29 C.F.R. §§ 102.52–59 (NLRB Rules and Regulations); *Mastro Plastics Corp.*, 136 N.L.R.B. 1342, 1346–47 (1962), *enforced as modified*, 354 F.2d 170 (2d Cir.1965), *cert. denied*, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966). Fluor Daniel tried unsuccessfully on cross-examination to show that the "volunteer union organizer" applicants were part of a union-sponsored "salting" campaign (see below). It was prohibited from pursuing this line of questioning, however.

One commentator has defined salting as the practice of "[h]aving union members or organizers take jobs with open-shop contractors to organize workers, or to harass or disrupt contractor operations." Herbert R. Northrup, *"Salting" the Contractors' Labor Force: Construction Unions Organizing with NLRB Assistance*, 14 J. Lab. Res. 469, 471 (1993). Northrup believes that salting campaigns are not bona fide attempts to organize workers. The Boilermakers' Union concedes that it has been conducting a campaign called "Fight Back" or "Strike Back" for the past fifteen years, but characterizes that campaign as an orthodox attempt to organize workers under federal labor law. The Boilermakers' Union argues that by bringing Northrup's article to this court's attention, Fluor Daniel is attempting to introduce expert testimony into the record without appropriate safeguards. Because Fluor Daniel did not call Northrup as an expert witness, the Boilermakers' Union asks that references to Northrup's article be stricken from the company's brief. The Boilermakers' Union also points out that Northrup once testified as an expert in a case before an ALJ of the N.L.R.B., *H.B. Zachry Co.*, 319 N.L.R.B. 967, 980, 1995 WL 785175, at *24 (1993) [hereinafter *H.B. Zachry I*], where his research was severely criticized. The ALJ in *H.B. Zachry I* found:

> One of the more interesting facts is that Northrup's expert opinion is based solely on conversations and consultation with [various] employers.... Northrup conceded that he had never interviewed a single employee at any jobsite concerning the Union's "Fight Back Program." Nor has Northrup spoken with any officer or other official of the Union regarding the program. Aside from the obvious potential bias in his expert opinion, Northrup also conceded that he had not done any study as to how much time "volunteer organizers" spend engaged in organizing activity once hired.

On November 29, 1991, the ALJ issued his decision in this case. He found that Fluor Daniel had violated Sections 8(a)(1) and (3) of

the Act by constructively discharging Bolen for refusing to cross a picket line, and by discriminating in its application process against the total of 54 applicants who he found had noted that they were "volunteer union organizers." The ALJ found evidence of anti-union animus in Fluor Daniel's behavior on five separate grounds: (1) not a single "volunteer union organizer" was hired, even though the qualifications of many were equivalent to those who were hired; (2) the treatment of the Coons brothers; (3) the treatment of Bolen; (4) the treatment of DeWitt; and (5) the "cavalier manner in which [Fluor Daniel] handled the applications of the 11 boilermakers it had received" in bulk for the fall outages.

The ALJ required Fluor Daniel to cease and desist its unfair labor practices, and to refrain from interfering in any similar fashion with employees or job applicants. He also ordered that Bolen be reinstated, and required Fluor Daniel to offer the other applicants named in his order positions with the company, or if those positions no longer existed, substantially equivalent positions. The ALJ required Fluor Daniel to make whole Bolen and the other applicants for any loss of pay and benefits, to expunge from its files any records of Bolen and the other applicants being unlawfully discharged or not hired, and to notify these employees of the completion of these measures. Additionally, Fluor Daniel was required to post remedial notice at all of its job sites within a 75–mile radius of Owensboro, Kentucky.

On May 28, 1993, the NLRB affirmed the ALJ in large part, although it reversed the ALJ's holding that DeWitt had been discriminated against. Fluor Daniel filed exceptions to the ALJ's order on the basis of *Ultrasystems Western Constructors, Inc. v. NLRB*, 18 F.3d 251 (4th Cir.1994), which holds that the NLRB must consider evidence on how many openings were available to potential discriminatees before ordering reinstatement of all of the individuals named in a charge. This motion was denied by the NLRB on November 12, 1993. Fluor Daniel filed a motion to reconsider on March 25, 1994, which was denied on July 31, 1994.

■ The NLRB filed its application to enforce its order with this court on September 1, 1994. We have jurisdiction over this case under 29 U.S.C. § 160(e).[6] Fluor Daniel presents four issues on appeal: (1) whether the volunteer union organizers can be considered "employees" under the Act; (2) whether the NLRB should have had to show evidence of job availability at the liability stage of its proceedings, rather than deferring that issue until its compliance proceedings; (3) whether the NLRB's alleged tacit participation in the Fight Back program constituted an abuse of its processes; and (4) whether the NLRB's order is supported by substantial evidence. We review the first three of these assignments of error *de novo*, as they involve pure questions of law. But Fluor Daniel's fourth assignment of error will, of course, be reviewed to determine if the NLRB's decision comports with the substantial evidence test. *Smiths Indus. v. NLRB*, 86 F.3d 76, 79 (6th Cir.1996) (citing *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir.1993)).

## II. VOLUNTEER UNION ORGANIZERS AS "EMPLOYEES" UNDER THE ACT AND THE CONTENTION THAT THE NLRB'S PROCESSES WERE ABUSED BY THE BOILERMAKERS' UNION

### A. Status of Volunteer Union Organizers under the Act

■ When Fluor Daniel first made the argument that the volunteer union organizers, or "salts," who applied to work for the company in this case could not be "employees" within the meaning of Section 2(3) of the Act, 29 U.S.C. § 152(3)[7], the issue was a

---

6. *Compare* 29 U.S.C. § 160(e) (NLRB as petitioner) *with* 29 U.S.C. § 160(f) (employer as petitioner). Though the NLRB petitioned to enforce one of its orders in this case, it is styled as the appellee rather than the appellant by operation of Fed. R.App. P. 15.1.

7. This portion of the Act provides:

The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any

debatable one. *Cf. Retail Clerks Union, Local 770 v. NLRB*, 370 F.2d 205, 208 (9th Cir.1966) (purpose of Act is to protect workers, not labor unions, citing Section 7 of the Act, 29 U.S.C. § 157); *1992–93 Annual Survey of Labor and Employment Law*, 35 B.C. L.Rev. 349, 351–65 (1994) (discussing cases splitting over the issue of whether *paid* union organizers were bona fide employees within the meaning of the Act). In *NLRB v. Elias Bros. Big Boy*, 327 F.2d 421, 427 (6th Cir. 1964), our circuit had long ago held that a waitress who met with a union secretary prior to applying for employment at a Big Boy restaurant, who received $15 per week from the union, and who worked as a full-time organizer after she left the Big Boy's employment was not a bona fide employee under the Act because it could be inferred that she had worked for the union before beginning her job as a waitress.[8] The Fourth and Eighth Circuits reached the same conclusion in accord with *Elias Bros. Big Boy* by excluding paid union organizers from the category of "employees" under the Act. *H.B. Zachry Co. v. NLRB*, 886 F.2d 70, 72 (4th Cir.1989) [hereinafter *H.B. Zachry II* ][9]; *Town & Country Elec., Inc. v. NLRB*, 34 F.3d 625, 628–29 (8th Cir.1994), *rev'd, —— U.S. ——*, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995). The Second, Third, and District of Columbia Circuits rejected the holding of *Elias Bros. Big Boy*, creating a circuit split. *NLRB v. Henlopen Mfg. Co.*, 599 F.2d 26, 30 (2d Cir.1979); *Escada (USA), Inc. v. NLRB*, 970 F.2d 898 (3d Cir.1992) (enforcing NLRB order without opinion); *Willmar Elec. Serv., Inc. v. NLRB*, 968 F.2d 1327, 1329–31 (D.C.Cir.1992), *cert. denied*, 507 U.S. 909, 113 S.Ct. 1252, 122 L.Ed.2d 651 (1993).

In this case, there is no evidence in the record that the volunteer union organizers were paid. Thus, Fluor Daniel is urging us to extend *Elias Bros. Big Boy* to exclude from the protection of the Act *unpaid* union organizers who were directed by their unions to inflict costs on non-union employers through sham organizing efforts. We would then have to decide, or remand for further factual development, the issue of whether the unpaid union organizers in this case fit Fluor Daniel's and Professor Northrup's description of "salts." Determining whether to take up Fluor Daniel's invitation was obviated by the Supreme Court's recent reversal of the Eighth Circuit's *Town & Country* decision, however. Therefore, *Elias Bros. Big Boy*, as well as the Fourth Circuit's *H.B. Zachry II* decision, have been overruled. And so we have no need to delve into the motivation of the unpaid union organizers in this case to determine if it is as distasteful as Fluor Daniel claims.

In *Town & Country, —— U.S. at ——*, 116 S.Ct. at 450, Justice Breyer, writing for a unanimous Court, held that paid union organizers applying for jobs were employees within the meaning of the Act. The Court noted at the outset of its opinion that the NLRB's construction of "employee" to include paid union organizers was reasonable, citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). *Id.* at ——, 116 S.Ct. at 453. The Court then considered dictionary definitions of "employee," which indicate that any person who works for another for financial gain is an "employee." *Id.* at ——–——, 116 S.Ct. at 453–54. Therefore, the Court concluded that the plain meaning of "employee"

unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.

8. The rationale of *Elias Bros. Big Boy* was skimpy. In that case the Sixth Circuit simply assumed that a paid organizer "planted" by a union could not possibly be an "employee" under the Act. *Elias Bros. Big Boy*, 327 F.2d at 423.

9. *H.B. Zachry II*, a case which dealt with the same union organizer, Barry Edwards, who directed the union's activities in this case, provides a host of rationales to support the result it reached, in contrast to *Elias Bros. Big Boy*.

includes any worker paid by one organization regardless of whether that worker is also paid by another organization. Suggesting that the plain meaning of "employee" was not the only consideration motivating the Court, however, is its citation to the legislative history of the Act, which supports a broad reading of the Act's provisions. *Id.* at ——, 116 S.Ct. at 454. Finally, the Court noted that a broad, literal reading of the term "employee" was consistent with other Supreme Court cases interpreting the Act. *Ibid.*

In response to the arguments from the text and legislative history of the Act ultimately accepted by the Court, the employer in *Town & Country* argued that the common law of agency was incorporated into the Act, citing cases defining "employee" decided under the Employee Retirement Income Security Act of 1984, the Copyright Act of 1976, and the Act itself. *See, e.g., NLRB v. United Ins. Co. of America,* 390 U.S. 254, 256, 88 S.Ct. 988, 989–90, 19 L.Ed.2d 1083 (1968) (construing "employee" and "independent contractor" under the Act with reference to the common law of agency). Specifically, the employer in *Town & Country* pointed to the Restatement (Second) of Agency § 226 cmt. a, at 499 (1957) [hereinafter "Restatement"], which provides that a worker cannot be a servant of two masters when "an intent to serve one necessarily excludes an intent to serve the other." The employer maintained that paid union organizers could act in various ways adverse to its interests such as by deserting the company upon the union's request, by disparaging the company to fellow workers, or by sabotaging the company or its products. *Town & Country,* —— U.S. at —— – ——, 116 S.Ct. at 454–56.

The Court rejected these arguments for a number of reasons. First, it distinguished *United Ins. Co. of America* on the ground that that case had held that the NLRB's construction of "independent contractor" in relation to "employee" was unreasonable, whereas in this case the NLRB's construction of "employee" was consistent with the common law. Second, it expressed a belief that defining paid union organizers as "employees" was not contrary to the common law of agency, citing § 226 of the Restatement, which allows a person to be a servant of two masters if such service "does not involve abandonment of the service" owed to one of the masters. In reaching this conclusion, the Court relied heavily on a treatise by Professor Seavey: " '[o]ne can be a servant of one person for some acts and the servant of another person for other acts, even when done at the same time,' for example, where 'a city detective, in search of clues, finds employment as a waiter and, while serving the meals, searches the customer's pockets.' " *Id.* at ——, 116 S.Ct. at 456 (quoting Warren A. Seavey, *Handbook of the Law of Agency* § 85, at 146 (1964)).[10]

■ Moving on to the claimed inconsistencies between the duties that were owed to the employer and those owed to the union, the Court noted that the employer in *Town & Country* was attempting to infringe upon activity protected by the Act.[11] The Court pointed out that the salting argument advanced by the employer suffered from three serious problems. First, the Court noted that there was no evidence in the record to suggest that the salting feared by the employer was anything more than a hypothetical possibility. *Ibid.* Second, and most significantly for our purposes, the Court noted that the salting argument proved too

10. Professor Seavey and the Supreme Court reach this conclusion only by conceptualizing the waiter's job as being limited to the positive duty of serving meals, rather than also embracing the negative duty to avoid searching customers' pockets.

11. This characterization seems to be unfair to the employer in the case because the employer's argument would have been better construed as one challenging the definition of the proper scope of protected activity under the Act. Picketing and refusals to cross picket lines, the protect-

ed activities central to this case, are not activities that are absolutely protected. For instance, 29 U.S.C. § 157, Section 7 of the Act, protects only "concerted activities" engaged in "for the purpose of collective bargaining or other mutual aid or protection." It could be argued that salting is motivated by purposes outside the legitimate scope of § 157. Furthermore, Section 8(b) of the Act, 29 U.S.C. § 158(b), defines unfair labor practices by unions. The existence of such practices in turn reduces the scope of protected activities under the Act.

much because it would apply to *unpaid* union organizers who could also leave an employer in the lurch or engage in some form of sabotage. *Ibid.* Finally, the Court noted that there were other remedies for salting, including negotiating fixed-term contracts to solve the first alleged problem of desertion, and disciplining or dismissing workers to solve the second alleged problem of sabotage. *Id.* at ——, 116 S.Ct. at 457.

*Town & Country* is binding upon this circuit and all others. It provides clear guidance about how the Court would be likely to treat this case. The second problem the Court found with the logic of salting is that it "proves too much" because it would seem to demonstrate that even unpaid union organizer job applicants should be excluded from protection as "employees" under the Act. *Town & Country*, —— U.S. at ——, 116 S.Ct. at 456. That the Supreme Court thought this to be a "serious problem[ ]," *ibid.,* with the salting argument indicates that the Court believes that unpaid union organizer applicants are most definitely "employees" under the labor laws. Therefore, under our reading of *Town & Country*, Fluor Daniel's argument that the unpaid union organizers in this case are not "employees" within the meaning of the Act must be rejected. *Town & Country* rejects all forms of the salting argument to the extent they suggest narrowing the definition of "employee."

### B. Alleged Abuses of the NLRB's Processes by the Boilermakers' Union

■ Fluor Daniel argues that the Union's Fight Back campaign is an abuse of NLRB processes, using the Act as a sword when it is intended only as a shield. An ALJ at the NLRB opined in a similar case:

It is not farfetched to regard the [union's] "strike back" strategy as built upon a form of entrapment reminiscent of other "blackmail" devices which in 1958 led to enactment of the Section 8(b)(7) strictures on recognition picketing.... [T]he employee protections of Section 8(a)(3) were central ingredients of a scheme whereby an unorganized employer would be pressured to capitulate, or go out of business, or face recurring union sponsorship of mass appli-

cations in the midst of future projects....
[A] serious question arises as to whether, through the complaint in this proceeding, the Board has been conscripted as an unwitting conspirator in the effort to achieve union goals—be they organizational or economic—through pressures, rather than through the statutory procedures designed to assure that compulsary [*sic* ] bargaining begins with procedures preserving freedom of choice.

*Sunland Constr. Co.,* 309 N.L.R.B. 1224, 1246, 1992 WL 390105, at *33 (1992). *See also Hollywood Ranch Market,* 93 N.L.R.B. 1147, 1154 (1951) (Teamsters "palpabl[y] abuse[d] ... the Board's machinery"). In the terminology of public choice economics, Fluor Daniel alleges that the NLRB has been captured by organized labor interests like the Boilermakers' Union. *See generally* Daniel A. Farber & Philip P. Frickey, *The Jurisprudence of Public Choice,* 65 Tex. L.Rev. 873 (1987).

Fluor Daniel's argument that the processes of the NLRB have been co-opted by the Boilermakers' Union goes hand in hand with its argument that labor unions have somehow impermissibly altered the definition of "employee" under the Act to include those applicants who were truly union agents. The courts of appeals are not platonic guardians of efficiency employing the philosophy of public choice economics. We do not have a roving and unrestricted jurisdiction that enables us to refuse to enforce otherwise appropriate orders of the NLRB based on pure economic theory. For Fluor Daniel's argument that the NLRB's processes were being abused to succeed in this case, a prohibition on such abuse would have to be rooted in a concrete provision of law. Because the only concrete provision of law that Fluor Daniel points to in connection with this argument (dicta from *Sunland* cannot suffice) is the definition of "employee" in the Act, and the Supreme Court has already rejected such an argument in *Town & Country,* we cannot accept any attempt to repackage that argument in a different form. Fluor Daniel's assignment of error relating to alleged abuses of the NLRB's processes must be rejected.

## III. DEFERRING PROOF OF JOB AVAILABILITY UNTIL THE COMPLIANCE PHASE OF THE PROCEEDINGS BEFORE THE NLRB

■ The NLRB deferred until the compliance stage of its proceedings the issue of whether there were appropriate job openings available for the particular applicants named in its complaint against Fluor Daniel. Relying on *Ultrasystems,* Fluor Daniel argues that the NLRB committed legal error by allowing this issue to be deferred until a stage in the proceedings when the burden of proof will shift to Fluor Daniel. Before we can address this assignment of error, we must decide whether we have the jurisdiction to review it.

■ Section 10(e) of the Act, 29 U.S.C. § 160(e), provides that, "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the [reviewing] court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." *See also International Ladies' Garment Workers' Union v. Quality Mfg. Co.,* 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 975 n. 3, 43 L.Ed.2d 189 (1975) (refusing to address an issue not charged or addressed before the NLRB); *NLRB v. Newtown Corp.,* 819 F.2d 677, 678 (6th Cir.1987) (per curiam) (same). The NLRB notes that Fluor Daniel first mentioned *Ultrasystems* in an untimely motion for reconsideration filed with the agency. *See* 29 C.F.R. § 102.48(d)(2) (motion for reconsideration and reopening of the record must be filed within 28 days). The Boilermakers' Union claims that Fluor Daniel objected to the remedies ordered by the ALJ only as they related to backpay and not on any ground based on *Ultrasystems.*[12] Fluor Daniel does not contest these arguments, but claims that it

attempted to raise the issue of job availability both before the NLRB and before the ALJ. The ALJ denied Fluor Daniel's motion in limine to require the General Counsel of the NLRB to specify the job positions the NLRB planned to contend Fluor Daniel had engaged in unfair labor practices in filling. That motion was denied, on the grounds that the General Counsel should be allowed to address this point in a post-hearing brief. Ultimately, the issue was deferred until the compliance stage of NLRB proceedings. In its exceptions to the ALJ's order and opinion filed with the NLRB, Fluor Daniel argued that the ALJ erred in denying this motion, claiming that this denial constituted a violation of due process of law because Fluor Daniel was thereby prevented from offering a timely and informed defense to the charges against it. Fluor Daniel further argued that the requirements for a prima facie case of unfair labor practices in a refusal to hire case should be structured differently than in a discharge case and that the ALJ had failed to match jobs with applicants' qualifications as a properly restructured prima facie case would require.

We hold that Fluor Daniel exhausted its administrative remedies in relation to this assignment of error and therefore by addressing it we do not violate the limitation on our jurisdiction in Section 10(e). Fluor Daniel's motion in limine attempted to force the NLRB's General Counsel to tie particular applicants to particular openings for which the applicants were qualified. In its exceptions filed with the NLRB after the ALJ rendered his decision, Fluor Daniel challenged the ALJ's ruling on the matter. Its brief in support of these exceptions to the NLRB unmistakably argued that the General Counsel should have to tie openings to applicants as part of its prima facie case.[13] Neither the motion in limine nor the brief filed

---

12. In a related argument, the Boilermakers' Union claims that Fluor Daniel has shifted defenses a number of times in this case and this alone is evidence of their violation of the Act. *See Bay State Ambulance & Hosp. Rental, Inc.,* 280 N.L.R.B. 1079, 1087, 1986 WL 68551, at *14 (1986) (shifting defenses constitute evidence that those defenses are pretexts to hide discrimination). However, because we ultimately hold that Fluor Daniel raised the issue of job matching at

every possible stage of the proceedings, and this is the only issue on which we refuse to enforce the NLRB's order, we reject the Boilermakers' Union's shifting defenses argument.

13. While this brief is not part of the administrative record, we granted Fluor Daniel's motion to lodge this brief as having been filed in the proceedings below.

in support of its exceptions mentioned *Ultrasystems,* but it would be overly narrow for us to construe the word "objection" in Section 10(e) as meaning that a party could not cite new authorities to support propositions advanced below.

Sections 8(a)(1) and (3) of the Act provide, respectively, that it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights [to join unions and collectively bargain, *inter alia*] guaranteed" in 29 U.S.C. § 157 or for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(1), (3). The General Counsel of the NLRB bears the burden of proof in unfair labor practices cases. Section 10(c) of the Act, 29 U.S.C. § 160(c) (violations of the Act can be adjudicated only "upon the preponderance of the testimony" taken by the NLRB); 29 C.F.R. § 101.10(b). *See also* Administrative Procedure Act § 7(c), 5 U.S.C. § 556(d) ("Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof.").

To refute Fluor Daniel's job matching argument, the NLRB invokes its decision in *Wright Line,* 251 N.L.R.B. 1083, 1089, 1980 WL 12312, at *11 (1980), *enforced by* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), which established the following analysis of causation in unfair labor practice discharge cases under the relevant provisions of the Act:

> [W]e shall henceforth employ the following causation test in all cases alleging violation of Section 8(a)(3) or violations of Section 8(a)(1) turning on employer motivation. First, we shall require that the General Counsel make a prima facie showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision [to discharge]. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.

*Wright Line* is explicitly based on the seminal Supreme Court Title VII case of *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See generally,* William H. DuRoss, *Toward Rationality in Discriminatory Discharge Cases: The Impact of Mt. Healthy Board of Education v. Doyle Upon the NLRA,* 66 Geo. L.J. 1109 (1978). The Supreme Court approved the NLRB's limited importation of Title VII causation analysis in *Wright Line. See NLRB v. Transportation Management Corp.,* 462 U.S. 393, 402–03, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983) ("the Board's construction here, while it may not be required by the Act, is at least permissible under it") (quoting *NLRB v. Weingarten, Inc.,* 420 U.S. 251, 266–67, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975)). The NLRB claims it has met its burden under *Wright Line* by proving that there were *some* vacancies in the jobs applied for by the voluntary union organizers and that Fluor Daniel harbored animus against these applicants because they engaged in activities protected by the Act.

Fluor Daniel, on the other hand, argues that we should take *Wright Line* further and now also apply the framework for Title VII refusal to hire cases set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to employment discrimination cases arising under the Act. *McDonnell Douglas* establishes that a prima facie case of race discrimination in the Title VII refusal to hire context consists of proving: (1) plaintiff belongs to a racial minority; (2) plaintiff applied for a job and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications the applicant was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications. *Id.* at 802, 93 S.Ct. at 1824. In *Hyatt Corp. v. NLRB,* 939 F.2d 361, 375 (6th Cir.1991), our court noted that "we have doubts that the Title VII analysis is applicable to cases under the NLRA." We agree with this general statement. The Act should not be read willy-nilly to import into the labor laws the entirety of the elaborate analysis of Title VII. *Cf. Pettway v. American*

*Cast Iron Pipe Co.,* 411 F.2d 998, 1005–06 (5th Cir.1969) ("reliance on the Labor Acts for interpretive guidance [in Title VII cases] must necessarily be guarded because the differences between those acts and Title VII may well outnumber the similarities"). However, for reasons that we explain below, we hold that setting a different prima facie burden in discriminatory discharge cases and refusal to hire cases arising under the labor laws is not only eminently sensible, but mandated by the terms of the Act. Moreover, it is not a significant departure from the NLRB's own precedent in this area.

■ Borrowing the familiar *McDonnell Douglas* prima facie analysis with appropriate modifications is the best way to address Fluor Daniel's reasonable objections without reinventing the wheel. In a refusal to hire case alleging an unfair labor practice in violation of Section 8(a)(1) and (3) of the Act, we hold the General Counsel's prima facie case will consist of proving: (1) that the employer is covered by the Act; (2) that the applicant is covered by the Act; (3) that the applicant actually applied for a job and was qualified for a job for which the employer was seeking applicants; (4) despite his qualifications the applicant was not hired; (5) anti-union animus contributed to the decision not to hire an applicant; and (6) after his rejection, the position remained open and the employer continued to seek applicants from persons with the applicant's qualifications.[14]

■ We reject the NLRB's argument that it should be able to establish a prima facie case of an unfair labor practice in a refusal to hire case simply by proving that there were *some* job vacancies applied for by the voluntary union organizers and that Fluor Daniel harbored animus against these applicants because they engaged in activities protected by the Act. It cannot be an unfair labor practice merely for an employer to harbor animus against union members applying for jobs that do not exist or have already been filled, or for which they are not qualified. If such conduct were an unfair labor practice, then the mere entertainment and expression of anti-union animus would constitute an unfair labor practice. Indeed, this is the NLRB's position. "[T]he Act is violated when an employer *fails to consider* an application for employment...." *Shawnee Indus.,* 140 N.L.R.B. 1451, 1452–53 (1963) (emphasis supplied).[15]

■ Such a holding does not comport with the requirements of Section 8(a)(1) and (3) of the Act. There is no interference with, restraint, or coercion of applicants in the

**14.** *See Ultrasystems,* 18 F.3d at 256 (establishing prima facie case in the refusal to hire context as consisting of showing: "(1) that the employer is covered by the Act; (2) that the employer at the time of the purportedly illegal conduct was hiring or had concrete plans to hire employees; (3) that anti-union animus contributed to the decision not to consider, interview, or hire an applicant; and (4) that the applicant was a bona fide applicant") (citing *Transportation Management Corp., H.B. Zachry II,* and *J.E. Merit Constructors, Inc.,* 302 N.L.R.B. 301, 303–04 (1991)). The fourth element of this prima facie case stems from *H.B. Zachry II* and, of course, was overruled in *Town & Country* by the Supreme Court. *J.E. Merit Constructors, Inc.* is, interestingly enough, another of the NLRB's cases arising from the Boilermakers' Union's Fight Back campaign. It modified *Wright Line* in the failure to hire context and provides that a prima facie case of this type consists in proving: "(1) applications were filed during hiring stages, (2) the Respondent knew of their source, (3) it harbored union animus, and (4) it acted upon that animus in failing to hire any from this group." *J.E. Merit Constructors,* 302 N.L.R.B. 301, 303–04, 1991 WL 76408, at *5 (1991).

**15.** The NLRB deems a failure or refusal to consider case to be made out when (1) some anti-union animus can be shown, (2) some union-affiliated applicants have been turned down, and (3) some job vacancies exist, even when there is no matching of animus, applicants, and vacancies. We note that from a literal perspective it cannot realistically be said that this constitutes even a "failure [or refusal] to consider." An employer who has no need for a particular applicant's services has not failed or refused to consider an applicant in violation of the Act. In fact, it is obvious that the employer probably did consider the applicant, but then decided to reject him because of a lack of qualifications for a suitable vacancy. We recognize, however, that the NLRB considers the three elements set out above to constitute a "failure [or refusal] to consider" case, which it considers to be different than a "failure [or refusal] to hire" case. *See Ultrasystems,* 18 F.3d at 255–56 (discussing the distinction the NLRB draws between these two concepts).

exercise of their protected rights when an employer, even with anti-union animus, rejects applicants who are in fact unqualified or for whose particular services the employer simply has no need. Therefore, no violation of Section 8(a)(1) exists· in these circumstances. Similarly, there is no "discrimination *in regard to hire*" in this situation in violation of Section 8(a)(3). Refusal to consider an applicant out of improper motive, without more, is not a violation of Section 8(a)(1) or (3) of the Act.

It might be maintained that this reasoning runs contrary to *Wright Line* as approved in *Transportation Management* because it fails to recognize that in "dual motive" or "mixed motive" cases the General Counsel is permitted to focus on only the discriminatory motive or motives of an employer to demonstrate a prima facie case, leaving other motives, such as legitimate business justifications, to be proved as an affirmative defense by the employer. *Transportation Management*, 462 U.S. at 400, 103 S.Ct. at 2473 ("proof that a discharge would have occurred in any event and for valid reasons amounted to an affirmative defense on which the employer carried the burden of proof by a preponderance of the evidence"). First, Fluor Daniel was not permitted to mount even such an affirmative defense to liability under *Wright Line* and *Transportation Management* because the NLRB deferred Fluor Daniel's introduction of evidence on the point until its compliance proceedings. It should be obvious, however, that the initiation of compliance proceedings presumes that a valid order of the NLRB exists to be complied with and this in turn assumes that unfair labor practices have been proven. If an employer is prevented from presenting evidence necessary to mounting its affirmative defense under *Wright Line*, however, then the NLRB cannot be permitted to argue that unfair labor practices have been shown and therefore cannot be permitted to argue that it is appropriate to enter a remedial order leading eventually to compliance proceedings. The NLRB cannot defer until compliance proceedings the employer's presentation of proof to support its affirmative defenses.

Second, matching up applicants with available jobs for which they are qualified is not akin to an affirmative defense and cannot be treated in this fashion. Unlike other legitimate business justifications for discharging employees, there is no potential "duality" or "mixing" of motives in a refusal to hire case·when no jobs exist for the applicant or where the applicant is unqualified for the jobs that are available. It is logically plausible to say that an employee was discharged *both* because he was a member of a union and because he was doing a bad job. The NLRB has established, and the Supreme Court has affirmed, a sequence of proof-taking that permits the NLRB to establish a prima facie case by showing only that a discriminatory motive was one of a "mixed" set of motives. Other feasible approaches might have included a "dominant motive" or "but-for" causality test. *See, e.g. Wright Line*, 251 N.L.R.B. at 1084–86, 1980 WL 12312, at \*4–\*6 (discussing the "dominant motives" test used by the First and Fourth Circuits before *Wright Line* and *Transportation Management* ). It is not logically possible to say that an employee was not hired *both* because he·was a member of a union and because there were no jobs available, however. The second motive completely predominates over the first. If there are no jobs available for any applicants, union or non-union, then it is simply irrelevant that the employer entertained even vehement animus against organized labor. Such an employer may take extra glee in turning down union applicants, but this in and of itself does not constitute an unfair labor practice. We have no desire (and no power) to disturb the NLRB's contributing factor test for discriminatory animus where it is applicable. We simply believe it is inapplicable in cases involving hiring rather than discharge or discrimination in other terms or conditions of employment against those already holding positions.

Requiring the NLRB to match qualified job applicants with jobs, while inconsistent with some NLRB decisions, is consistent with the verbal formulation of a prima facie case in the refusal to hire context in at least

one other.[16] In *J.E. Merit Constructors, Inc.*, 302 N.L.R.B. 301, 304, 1991 WL 76408, at *5 (1991), the NLRB held that one of the elements of the General Counsel's prima facie case in an unfair labor practices action involving refusal to hire is proof that an employer "*acted upon* that animus in failing to hire any [union-affiliated workers] from this group." (Emphasis supplied.) The General Counsel does not carry this burden when there is no linking of jobs to qualified applicants because in this situation there is no showing that the employer "*acted* upon [a discriminatory] animus." In situations like that presented by this case, the employer "acts upon" solely the non-availability of jobs or the unqualified nature of the applicant.

The Fourth Circuit's *Ultrasystems* decision generally supports the approach we have taken above, but the holding of that case differs in significant respects from our holding here. In *Ultrasystems*, the NLRB found that an employer refused to consider 66 applicants at two California construction sites because of anti-union animus. The NLRB, *inter alia*, required this employer to cease and desist from its discriminatory treatment of applications and offer employment and backpay to all 66 of the applicants named in the General Counsel's complaint. The remedies ordered by the ALJ and approved by the NLRB in this case are similar to those ordered in *Ultrasystems*.

The NLRB pointed to its holding in *KRI Constructors, Inc.*, 290 N.L.R.B. 802, 1988 WL 213997 (1988), to support its cross-petition to the Fourth Circuit for enforcement of its order:

"[T]he Act is violated when an employer fails to consider an application for employment for reasons proscribed by the Act and the question of job availability is relevant only with respect to the employer's backpay obligation." Therefore, "final determination of job availability and possible backpay liability will be properly left to compliance."

*Ultrasystems*, 18 F.3d at 256 (quoting *KRI Constructors*, 290 N.L.R.B. at 812, 1988 WL 213997, at *18) (citations omitted). The Fourth Circuit reacted to *KRI Constructors* in the following manner:

The selected language may be read to suggest that if the backpay remedy were not sought by the General Counsel, job availability would not be a necessary element of a violation. No case, however, has said that directly, and we question whether merely an employer's discriminatory handling of an application could be the basis for a violation, even when not linked to any employer hiring. The statute speaks unambiguously of discrimination "in regard to hire".... If an employer is not hiring, and the application is not one that ordinarily would be retained for purposes of future hiring, such as may be the case in the construction industry, it would appear questionable that the simple decision of refusing to consider an application, without more, states a violation. Some nexus is necessary to link the anti-union animus with a hiring decision.

*Ultrasystems*, 18 F.3d at 256. We agree, and for that reason impose a nexus requirement on the General Counsel's prima facie case by borrowing and modifying the *McDonnell Douglas* framework for refusal to hire cases alleging violations of Section 8(a)(1) and (3) of the Act.

*Ultrasystems* stopped short of our modification to the General Counsel's prima facie case, however. *Ultrasystems* held that as long as some openings existed for which the applicants named in a complaint applied, the General Counsel has presented a prima facie case and can defer matching jobs with qualifications until compliance proceedings, unless the employer shows that *none* of a group of applicants would have been hired without the impermissible motive. *Id.* at 256–57. The NLRB even seems to have endorsed the latter exception in *Bay Control Servs., Inc.*, 315 N.L.R.B. 30, 30 n. 2, 1994 WL 543119, at *1 n. 2 (1994) (where *no* employees were needed on the specific days applicants sought

---

16. Admittedly, however, our holding is not consistent with the result in *J.E. Merit Constructors*. *See* 302 N.L.R.B. at 303 n. 14, 1991 WL 76408, at *16 n. 14 ("number of vacancies that might have been available for named discriminatees is a matter for determination in any future compliance proceeding").

employment, General Counsel had not established an unfair labor practice). Most significantly, *Ultrasystems* held that the NLRB exceeded the scope of its remedy powers under Section 10(c) of the Act, 29 U.S.C. § 160(c), by ordering the hiring of the 66 applicants named in the complaint and backpay for these workers. Because only discrimination in regard to the treatment of applications had been found at that stage, the only remedy the NLRB could properly initiate at the time was a cease and desist order to stop this employment practice. It would have to wait until compliance proceedings when particular applicants and jobs would be matched to enter an order requiring hiring and backpay. On December 15, 1995, shortly after we heard oral argument in this case, the central holding of *Ultrasystems* was surprisingly adopted by the NLRB. *See H.B. Zachry Co.*, 319 N.L.R.B. 967, 967, 1995 WL 785175, at *2 (1995) (holding backpay and immediate employment remedies for job applicants were "overbroad," citing *Ultrasystems* ) [hereinafter *H.B. Zachry III* ].

The resolution we reach in this case, as well as the resolution reached by the Fourth Circuit in *Ultrasystems* and by the NLRB in *H.B. Zachry III,* are designed to address the same problem. Rather than addressing this problem by limiting the scope of the NLRB's power to enter remedies, however, and leaving the NLRB with the relatively easy task of making out a prima facie case in refusal to hire cases, we think it preferable to take up these matters in their proper logical order by more carefully defining the NLRB's prima facie burdens and leaving the NLRB with a broad panoply of remedies once a prima facie case is made out and a violation of the Act has been found on the facts. *See NLRB v. J.H. Rutter–Rex Mfg.*, 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969) ("As with the Board's other remedies, the power to order back pay 'is for the Board to wield, not for the courts.'") (quoting *NLRB v. Seven–Up Bottling Co.*, 344 U.S. 344, 346, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953)). Determining the scope of an employer's liability in compliance proceedings seems to us counterintuitive, even backwards. Compliance proceedings are better focused upon remedial questions. Furthermore, our resolution of

the sound objections raised by Fluor Daniel allows us to avoid its claim that permitting the NLRB to defer the matching of open jobs with qualified workers until compliance proceedings violates due process. *See NLRB v. Catholic Bishop*, 440 U.S. 490, 505–07, 99 S.Ct. 1313, 1321–22, 59 L.Ed.2d 533 (1979) (limiting the NLRB's jurisdiction so as to avoid potential First Amendment difficulties).

Other than relying on its own cases, including one where Fluor Daniel was treated in similar fashion by the NLRB, *Fluor Daniel, Inc. and International Bhd. of Boilermakers*, 304 N.L.R.B. 970, 981, 1991 WL 181860 at *19 (1991), the NLRB cites inapposite cases involving remedial orders entered to aid employees who had ceased to be strikers and desired to return to work. *See, e.g., J.H. Rutter–Rex Mfg.*, 396 U.S. at 260–61, 90 S.Ct. at 418–19 (noting that the NLRB had delayed calculation of backpay award to formerly striking workers until compliance proceedings for employer's violation in refusing to bargain with the strikers' labor union, but not holding that this procedure was acceptable or mandatory under the terms of the Act); *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 411, 80 S.Ct. 441, 447–48, 4 L.Ed.2d 400 (1960) (Frankfurter, J., concurring) ("two-stage procedure of the Board" in backpay striker cases is not questioned in this case); *Waterbury Hosp. v. NLRB*, 950 F.2d 849, 856 (2d Cir.1991) ("though the Board's Decision did not precisely identify or quantify the returning strikers who were denied their prior, or substantially equivalent, positions because their positions were occupied by nonstrikers who were not found to be permanent replacements, it was not inappropriate for the Board to postpone the identification of those injured strikers until the compliance stage of the proceedings"); *Rogers Mfg. v. NLRB*, 486 F.2d 644, 649 (6th Cir. 1973) (leaving until compliance proceedings the question of which lone striker out of fourteen would not be entitled to reinstatement when the NLRB only had the authority to reinstate thirteen strikers), *cert. denied,* 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288 (1974). Cases involving the discharge of or refusal to rehire strikers are entirely distin-

guishable from cases where applicants merely request jobs that may be nonexistent or for which they are not qualified. In the latter cases, there is no assurance that a violation of the Act has occurred. In the former, a violation is much more likely and any dispute will probably focus on the purely ministerial functions that often remain after a determination of liability is made, for instance, the calculation of the amount of backpay awards. *See Marlene Indus. v. NLRB,* 712 F.2d 1011, 1020 (6th Cir.1983) (NLRB can defer to compliance proceedings the mere computation of backpay, but not a determination of entitlement to backpay).[17] Some formerly striking workers, for instance, may have been able to find other employment and mitigate their damages or they may have refused other employment and therefore may not be entitled to backpay at all. *See Phelps Dodge Corp.,* 313 U.S. at 197–200, 61 S.Ct. at 853–55 (discussing the latter situation).

Also distinguishable are cases where the new purchaser of a firm refuses to rehire the entire union labor force of its predecessor. *See, e.g., Packing House and Indus. Servs., Inc. v. NLRB,* 590 F.2d 688, 697–98 (8th Cir.1978) (en banc) (per curiam). Nothing as broad as the *Packing House* problem is involved in this case. Obviously, it is more sensible to impose heavier burdens, in the form of a lighter prima facie case for the NLRB, on an employer who inherits an entire unionized labor force that it claims is inadequate when compared with an employer who merely turns down job applicants. Fluor Daniel did not succeed to ownership of a firm with a unionized workforce or refuse to reinstate workers that had gone out on strike against it. In this case, Fluor Daniel had definite hiring needs and those needs should receive individualized treatment by the NLRB when proving its prima facie case at the liability stage of its proceedings.

Even though it adamantly maintains that job matching at the liability stage of the NLRB's proceedings is unnecessary, at oral argument the Boilermakers' Union claimed that there was substantial evidence in the record that would match job openings at the relevant times with qualified voluntary union organizer applicants. We decline the invitation to delve into the record in search of such evidence without initially having the expert guidance of the NLRB's fact-finding, however. Also of great usefulness in our review of further petitions for enforcement in this case, should the NLRB decide to file such petitions, will be the focused interplay of the adversary process in relation to this issue, since up until this time the General Counsel has refused to match openings with qualified applicants. Therefore, we will remand to the NLRB on the issue of whether the General Counsel can prove the elements, as we have defined them, of a prima facie case of unfair labor practices against the voluntary union organizers named in the complaint. The exceptions to this remand are the Coons brothers, whose cases for discrimination in violation of the Act we treat in Section IV.B., *infra,* and the issue of whether Bolen was unlawfully discharged, which we treat in Section IV.A., *infra.* In further proceedings relating to the applicants who are the subject of our remand, the NLRB may also want to reconsider its finding that Richard B. Bowlds wrote "voluntary union organizer" on his application and how this bears on the logically subsequent finding that Fluor Daniel was motivated by discriminatory animus in refusing to hire him. Even the NLRB's appellate counsel now concedes that the finding relating to whether Bowlds designated himself as a "voluntary union organizer" was erroneous.

## IV. BOLEN AND THE COONS BROTHERS

■ This court reviews the NLRB's factual findings to determine whether they are supported by substantial evidence in the record as a whole. If such substantial evidence exists, the NLRB's factual findings are conclusive. 29 U.S.C. § 160(e); *Universal Cam-*

---

**17.** *Marlene Industries* is thus similar to *Ultrasystems* in holding that the remedy ordered by the NLRB is too broad. However, even after *Marlene Industries,* we consider ourselves free to accept some of the teachings of *Ultrasystems*

without following it completely because *Marlene Industries* was not a case where the nature of the General Counsel's prima facie burdens in refusal to hire cases was challenged. *Marlene Industries*

*era Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Turnbull Cone Baking Co. v. NLRB,* 778 F.2d 292, 295 (6th Cir.1985).

### A. Bolen

■ Substantial evidence supports the finding that Fluor Daniel representatives told Bolen that he would be dismissed for honoring a picket line on the third occasion. This finding involved a simple credibility determination. The ALJ's credibility determination had a rational basis, and so it must be upheld. *NLRB v. Baja's Place,* 733 F.2d 416, 421 (6th Cir.1984). While the NLRB could have rationally found that Fluor Daniel threatened to discharge Bolen after he walked out because of the initial picketing, the NLRB could not and did not find that he was actually discharged at this time. This is because Bolen telephoned the company after the conclusion of the first round picketing at the first Wilson outage in April asking to go back to work, and in fact went back to work. Thus, Fluor Daniel never made good on its threat at that time.

When the second round of picketing occurred, and Bolen again refused to cross the picket line, the NLRB found, and substantial evidence supports this finding, that a Fluor Daniel representative promised to call him back if the picket line went down. The representative never called back, however, and Bolen never returned to work. The NLRB found, and substantial evidence supports this finding, that the representative ordered a termination slip drawn up for Bolen on the third day Bolen was terminated. On this basis, the NLRB reached a conclusion of fact that Bolen had been constructively discharged, which made foregone the conclusion of law that Fluor Daniel had engaged in an unfair labor practice in light of the other evidence of anti-union animus present in the record.

Fluor Daniel argues that while a threat to discipline or discharge a worker for refusing

to cross a picket line violates the Act, *NLRB v. Difco Labs., Inc.,* 427 F.2d 170, 170–72 (6th Cir.) (per curiam), *cert. denied,* 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 65 (1970), an employer has no duty to seek out striking employees at the end of a strike and ask them to return to work, citing *Laidlaw Corp.,* 171 N.L.R.B. 1366, 1369 (1968), *enforced,* 414 F.2d 99 (7th Cir.1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). Therefore, reasons Fluor Daniel, it did not constructively discharge Bowen or commit an unfair labor practice in failing to recontact him.[18]

Ironically, the NLRB does not attempt to refute Fluor Daniel's argument with an analysis of what *Laidlaw* actually held. Even a cursory reading of *Laidlaw* and related cases shows that Fluor Daniel's argument is flawed, however. In *Laidlaw,* the NLRB considered the case of an employer who was struck by a substantial part of its unionized workforce. The employer hired striker replacements, some of whom had departed its employ leaving unfilled vacancies, by the time a large number of strikers had decided to abandon the strike. At this stage, the former strikers desirous of returning to work sent form letters to the employer conveying their unconditional offer to return to work immediately. The employer offered what vacant jobs there were to these former strikers on that day and continued to offer jobs to former strikers as they subsequently applied for reinstatement when there were vacancies open at the time of application. Workers who were refused reinstatement because there were no vacancies on that day rejoined the strikers. Because this piecemeal process of reinstating only those who applied for reinstatement on a particular day when openings existed was insufficient to meet all of the employer's hiring needs, the employer sometimes resorted to advertising for new employees. *Laidlaw* held that it was an unfair labor practice for the employer not to have *sought out* and offered vacancies as they became available to the strikers who had earlier offered to return to work. *Laid-*

---

involved only the scope of the NLRB's remedial powers.

**18.** *Laidlaw* is a case involving the reinstatement of workers on strike. The instant case does not involve a strike and Bolen is therefore not a

striker with a right to reinstatement. However, we construe Fluor Daniel's reliance on *Laidlaw* in this instance to concede that *Laidlaw* applies to cases involving employees who honor a picket line, even when the picket line is not related to a strike.

*law,* 171 N.L.R.B. at 1369 ("having signified their intent to return by their unconditional application for reinstatement and by their continuing presence, it was incumbent on Respondent to seek them out as positions were vacated"). The Seventh Circuit affirmed. *Laidlaw,* 414 F.2d at 105 ("Although there is a 'legitimate and substantial business justification' for requiring replaced economic strikers to wait for reinstatement until a vacancy occurs in the labor force, no justification was advanced by Laidlaw for its decision to consider the employment status of striker-applicants terminated if, on the day they applied for reinstatement, their former positions were still occupied by permanent replacements.").

Therefore, while *Laidlaw* did not hold that an employer has any general duty to contact former strikers after a strike has ended, it did require an employer to seek out former strikers when those strikers had already offered to return to work. In our case, substantial evidence supports the NLRB's finding that Fluor Daniel knew Bolen wanted to return to work after the second picket line came down. "The company could not possibly have entertained any reasonable doubts that the strikers [in *Laidlaw*] wanted their jobs back." *Id.* at 106. The same is true of Bolen in this case. It would be overly technical for us to conclude, contrary to the spirit of the labor laws, that even after Fluor Daniel had made an affirmative representation that it would recontact Bolen when the strike at the Wilson outage had ended, it was Bolen who had a duty to recontact Fluor Daniel. "[The] basic right to jobs [for strikers applying for reinstatement] cannot depend upon job availability as of the moment when the applications are filed. The right to reinstatement does not depend upon technicalities relating to application." *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 381, 88 S.Ct. 543, 547, 19 L.Ed.2d 614 (1967).

In *Laidlaw,* the employer raised a significant concern about imposing a continuing duty on employers to recontact striking or formerly striking workers who have been displaced: "Laidlaw argues that the Board's decision 'creates in perpetuity a vested interest of an employee in the job, or any substan-

tially equivalent job, he held when he first went on strike.' It asks: 'When does a striker's right to reinstatement expire, if ever?'" *Laidlaw,* 414 F.2d at 105. We recognize this concern, but it is not implicated here where Fluor Daniel placed a termination slip in Bolen's file only a few days days after he had offered to return to work at the conclusion of the second round of picketing. The record does not reflect when the picketing activity ended, but Fluor Daniel represents that there were no signs of Boilermakers' Union activity during the fall outages. Therefore, if we assume picketing activity continued through the entirety of the remaining spring outages, then at most this second round of picketing could have lasted about two months. In *NLRB v. Hartmann Luggage Co.,* 453 F.2d 178, 182 (6th Cir.1971) (citing *Fleetwood Trailer* ), we concluded that strikers did not lose their status as "employees" twelve months after the beginning of a strike and one to four months after the end of the strike. *See also NLRB v. American Olean Tile Co.,* 826 F.2d 1496, 1499 (6th Cir.1987) ("The right to reinstatement does not expire if there are no vacancies for which the striker is qualified when he first applies. The request must be treated as a continuing one until the striker has obtained 'other regular and substantially equivalent employment.'") (quoting *Fleetwood Trailer* and citing *Laidlaw* approvingly).

Pursuant to Fed. R.App. P. 28(j), Fluor Daniel brought to our attention two cases that it believes support its argument that Bolen was not constructively discharged in violation of the Act. The first is *Shopmen's Local Union No. 733 v. NLRB,* 219 F.2d 874 (6th Cir.), *cert. denied,* 350 U.S. 835, 76 S.Ct. 70, 100 L.Ed. 745 (1955). *Shopmen's Local* denied a petition for review from a union dissatisfied with an NLRB order that found strikers were not discharged by a letter that the employer had stipulated was a termination notice, because the employer later failed to carry through with its termination threat when it reinstated strikers who applied to return to work. The employer had even clipped a copy of the letter to each of the strikers' employment files. This case does not hold that striking workers have a duty to reapply continuously for work, how-

ever. Even if it had so held, it would be called into question by the Supreme Court's decision twelve years later in *Fleetwood Trailer*. If the NLRB had found that Bolen was discharged at the time he honored the first picket line, then *Shopmen's Local* might be useable by the company to argue that its later reinstatement of Bolen was inconsistent with such a finding, just as the company's later behavior in reinstating workers in *Shopmen's Local* was inconsistent with its earlier letter to strikers. But the NLRB found that Bolen had been discharged after the *second* round of picketing and there is nothing Fluor Daniel did later that undercuts this finding.

In the other supplemental case cited by Fluor Daniel, our court stated in a footnote: "The record shows that Marlene placed termination notices in the files of some of the striking employees. Contrary to the Union's contention that this constituted unlawful discharge in violation of the Act, we hold that absent evidence that the notice of termination was effectively communicated to the strikers, it cannot be found that they were constructively discharged." *Marlene Indus.*, 712 F.2d at 1013 n. 4. Fluor Daniel neglects to point out, however, that the *Marlene Industries* court held later in its opinion that the employer's obligation to reinstate strikers was triggered after their union had sent the employer a letter expressing a desire to return to work. *Id.* at 1017–18 (citing *Fleetwood Trailer*). We hold that Bolen's expression of a desire to return to work once the second picket line came down was equivalent to the offer letters in *Marlene Industries* and *Laidlaw.* There is no significance in Bolen's having expressed the intention to return to work at the same time he began to honor the picket line, rather than after a subsequent demand by Fluor Daniel for him to return to work, as occurred in those other two cases. Nor is there any significance in Bolen's expression of an intention to return to work only *after* the picket line had come down as opposed to immediately. We will deny Fluor Daniel's petition for review with respect to the discharge of Bolen and grant the NLRB's petition to enforce its order and all remedies relating to the discharge of Bolen.

**B. Coons Brothers**

While we are remanding this case with respect to most of the "voluntary union organizers" for a determination of whether a prima facie case of unfair labor practices can be made out with respect to Fluor Daniel's refusal to hire them, we treat the Coons brothers separately in this subsection because the NLRB devoted particular attention to whether the Coons brothers were qualified as tube welders, even though it did so only for the purpose of showing animus in relation to this category of applicants generally. Thus, there has been explicit attention paid to whether a prima facie case has been stated of unfair labor practices against the Coons brothers. We need consider only whether substantial evidence supports the NLRB's conclusion that the Coons brothers were treated disparately because of their self-designation as "voluntary union organizers."

The NLRB's finding that the Coons brothers were discriminated against in violation of the Act rests on four observations. First, the NLRB hinted that Fluor Daniel had purposely failed the Coons brothers on their tube welding test. Second, the NLRB found that one applicant who failed the tube welding test, Gary Harper, was allowed to retake it. He passed the test on his second attempt. Third, the NLRB found that two workers who failed the tube welding test were hired anyway. Fourth, the NLRB found that Bolen and another applicant were given the easier stick welding test and hired. *ALJ's Opinion*, 311 N.L.R.B. at 505–06, 1993 WL 188276, at *14.

The NLRB never actually found that Fluor Daniel had somehow "cooked" the results of the tube welding test against the Coons brothers. Therefore, we need not inquire into whether substantial evidence supports this conclusion. We have doubts about whether substantial evidence exists to support the argument that the NLRB's last two observations lead to the *conclusion* that the Coons brothers were treated disparately out of anti-union animus, but we need not address these observations in detail because the NLRB's second observation is basis enough on which to grant enforcement of the

NLRB's order with respect to the Coons brothers.

■ Substantial evidence supports the finding that Harper failed the tube welding test the first time, but was allowed to retake it and pass. Substantial evidence also supports the conclusion that Harper was treated disparately when compared with the Coons brothers, as well, although the NLRB did not specifically point to the evidence in the record necessary to support this conclusion. Fluor Daniel asks us to take notice of the fact that the Coons brothers did not ask to be retested like Harper, implying that Harper went the "extra mile" and was not given preferential treatment. If the Coons brothers had asked to be retested and were denied this opportunity, then it would be patent, in the absence of some other explanation for the refusal, that they were treated differently than Harper, who had not self-designated as a "voluntary union organizer." The obvious conclusion Fluor Daniel hopes that we will reach from this argument is frustrated by our review of the record, which has located evidence, even though contradicted elsewhere, that Fluor Daniel hired Harper the same day he took his first tube welding test without waiting to see the results of that test. The Coons brothers, by contrast, did not receive such favorable treatment. "Where the evidence supports two conflicting views, we may not disturb the Board's findings and its order must be enforced." (*W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir.1995) (citing *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464–65)). Therefore, the NLRB had substantial evidence for concluding that the Coons brothers had been discriminated against in violation of the Act.

## V

We **GRANT** the NLRB's petition for enforcement with respect to Bolen's discharge and Fluor Daniel's refusal to hire the Coons brothers. We **REMAND** to the NLRB the issue of Fluor Daniel's refusal to hire the remaining "voluntary union organizer" applicants for a determination of whether the job openings that were available can be matched with qualified applicants consonant with the elements of a prima facie case as we have defined them.

DAUGHTREY, Circuit Judge, concurring in part and dissenting in part.

While the majority offers a thorough and scholarly opinion, I believe that its interpretation of the *prima facie* elements in a "refusal to hire" case exceeds the bounds of controlling precedent and statutory law. For this reason, I respectfully dissent from Section III of the majority opinion and concur in the remainder.

The foundation of § 8(a)(1) and (3) "failure to hire" claims lies not in *Wright Line,* 251 N.L.R.B. 1083, 1980 WL 12312, at *11 (1980), *enforced by* 662 F.2d 899, 904 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), but in the early case history of the National Labor Relations Act. In 1941, the United States Supreme Court first applied § 8(a)(3) to hiring decisions, holding that an employer may not discriminate against an applicant because of that person's union status. *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 185–87, 61 S.Ct. 845, 848–49, 85 L.Ed. 1271 (1941). Writing for the Court, Justice Frankfurter reasoned that allowing an employer to judge an applicant based on union membership would destroy the economic balance between labor and business and undermine the policy of the Act. "The effect of such discrimination is not confined to the actual denial of employment," he explained, but "inevitably operates against the whole idea of the legitimacy of organization. In a word, it undermines the principle which, as we have seen, is recognized as basic to the attainment of industrial peace." *Id.* at 185, 61 S.Ct. at 848.

While the environment of labor law and labor relations has changed, the fundamental standards of the NLRA have not faltered. The purpose behind § 8(a)(1) and (3), the same purpose described by Justice Frankfurter, remains intact. *Wright Line,* as endorsed by the Supreme Court in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 402–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983), provides a clear and organized approach to cases in which an employer discriminates "in regard to hire or

tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." § 8(a)(3), 29 U.S.C. § 158(a)(3). The language of § 8(a)(1) and (3) is clear and the guidelines of *Wright Line* dutifully support its requirements.

Dissecting the various forms of § 8(a)(1) and (3) "failure to hire" violations only belittles the precedent upon which it rests. The majority limits its new *prima facie* elements to those cases in which an established employer seeks applicants for newly created jobs. This standard would not apply to new employers who are the successors to a prior business or old employers rehiring applicants following a strike. The majority purposefully tailors its new *prima facie* case to situations in which it finds a need for extra employer protection. In doing so, however, I fear that it may be creating further confusion in an area of law that already struggles beneath heavy and often befuddling opinions. *Wright Line* offers an exceptionally clear standard that applies to all § 8(a)(3) claims, regardless of the factual twist.

In addition, these new *prima facie* elements do not solve any regularly occurring problem in § 8(a)(1) and (3) litigation. This court now requires the General Counsel to establish that an applicant is qualified for a job, as a prerequisite for any charge of anti-union discrimination. Under *Wright Line,* this had been an affirmative defense for the employer, based on the assumption that anti-union discrimination is inherently undesirable. By transforming this affirmative defense into an element of § 8(a)(3), we tip the balance heavily in favor of the employer. We tacitly say that anti-union discrimination is acceptable, that an employer need not explain its anti-union animus when it violates the law.

Under the precedent of *Phelps Dodge* and *Wright Line,* as well as the unambiguous language of § 8(a)(3), anti-union discrimination itself is the predecessor act that may lead to a violation of the law. We excuse the employer who would not have hired a pro-union employee in spite of anti-union feelings, giving that employer the benefit of its legal motive and also requiring that employer

to show by a preponderance of the evidence that it deserves that benefit. *Transportation Management Corp.,* 462 U.S. at 395, 103 S.Ct. at 2471. Shifting the burden to the General Counsel sanctions the discrimination that the statute clearly abhors. It forces the General Counsel to disprove the employer's own defense, as well as prove the required elements of the statute itself.

Carrying this theme even further, the majority adds yet another element to the requirements of the Act. The General Counsel must prove that, after the employer rejected a union applicant, the position remained open and the employer continued to seek other applications. The majority sees this, as well as the previous element, as an appropriate application of Title VII case law to the NLRA. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Aside from the vast social and legal differences between Title VII and the NLRA, this requirement further undermines the philosophy of the Act. The discrimination itself forms the basis of the violation, while the non-existence of the job is the business defense to that discrimination.

Ignoring the language of the Act, the majority argues that the non-existence of an open position negates any § 8(a)(1) and (3) claim and that "it is simply irrelevant that the employer entertained even vehement animus against organized labor." The majority is particularly dismayed by the fact that the administrative law judge in this case deferred any evidence about open job positions until the compliance stage of the hearing. One faulty decision, however, should not lead to a brash revision of established precedent. I agree that evidence concerning the non-availability of jobs may serve as a legitimate defense to § 8(a)(1) and (3) claims, but we should not rewrite the law entirely in order to remedy perceived error. Forcing the General Counsel to prove the existence of an open position and the continued acceptance of applications buries the real purpose of § 8(a)(3) beneath a mound of legal maneuvering. If the non-existence of an open position is so evident, *Wright Line* adequately protects that employer with a safe affirmative defense.

The majority finds the flexibility to create a new standard for § 8(a)(1) and (3) "failure to hire" claims in the shortage of case law for this particular area. Indeed, there are very few cases in which an established employer refuses to hire new applicants based on their pro-union affiliation, where the employer is not a successor to another business or re-hiring workers following a strike. The lack of specific examples, however, does not mean that the law remains unmolded. There is no question that *Wright Line* applies to "failure to hire" cases in general. *See e.g., Monfort, Inc. v. NLRB,* 965 F.2d 1538, 1540 (10th Cir.1992); *U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1315 (7th Cir.1991) (*en banc*), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992); *Pergament United Sales, Inc. v. NLRB,* 920 F.2d 130, 137 (2d Cir.1990); *United Food & Commercial Workers Int'l Union v. NLRB,* 768 F.2d 1463, 1475 (D.C.Cir.1985). The District of Columbia Circuit has even held that *Wright Line* would apply to "failure to hire" cases like the specific one discussed here. *Willmar Elec. Serv. v. NLRB,* 968 F.2d 1327, 1328 (D.C.Cir.1992), *cert. denied,* 507 U.S. 909, 113 S.Ct. 1252, 122 L.Ed.2d 651 (1993). Most convincing, however, is the fact that this circuit applied the *Wright Line* test to a "failure to hire" claim similar to this one, years before the Supreme Court endorsed it. *NLRB v. Consolidated Freightways Corp. of Delaware,* 651 F.2d 436, 437 (1981).

The majority attempts to circumvent this precedent by using cases like *Ultrasystems Western Constructors, Inc. v. NLRB,* 18 F.3d 251 (4th Cir.1994) and *J.E. Merit Constructors, Inc.,* 302 N.L.R.B. 301, 1991 WL 76408 (1991), to support its new *prima facie* elements. Neither case, however, comes close to the dramatic revisions proposed here. *Ultrasystems* merely provides a different slant on the *Wright Line* requirements. It does not saddle the General Counsel with the onerous burden of proving employee qualification and job availability in addition to anti-union animus. 11 F.3d at 256. *J.E. Merit,* while also revising the *Wright Line* approach, is still faithful to precedent. It maintains the statute's legal balance and falls well short of the requirements that the majority

in this case envisions. 302 N.L.R.B. 301, 1991 WL 76408, at *5.

In general, I believe that the majority's revisions to the *prima facie* case for "failure to hire" claims may drain § 8(a)(3) of its protective strength. Considering the narrow application of this new approach, it will only confuse the litigants who once dealt with a clear and predictable *Wright Line* test. Considering the revolutionary shift it brings to § 8(a)(1) and (3) burdens of proof, it threatens to undermine the purpose of the Act. As a result, I fear that it could bring about an imbalance in the labor law that neither the drafters of the statute nor Justice Frankfurter would have tolerated. *See Phelps Dodge Corp.,* 313 U.S. at 181–200, 61 S.Ct. at 845–55 (Frankfurter, J., for the majority).